UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RONALD BRENNAN JR.,

                        Plaintiff,

            v.

ANTHONY ASTON, et al.,

                        Defendants.

Case No. 17-1928-JCC-MLP

REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Plaintiff, a state prisoner who is proceeding *pro se* and *in forma pauperis*, initiated this 42 U.S.C. § 1983 civil rights action while he was a pretrial detainee at the Snohomish County Jail ("SCJ"). In his verified second amended complaint ("SAC") and statement of claims, he brings numerous claims against over 20 SCJ employees. (SAC (Dkt. # 27); Claims (Dkt. # 27-1).) Currently before the Court are two motions for summary judgment. (Mot. 1 (Dkt. # 236); Mot. 2 (Dkt. # 244).)

In the first motion, Classification Supervisor Kimberly Parker moves for summary judgment on Plaintiff's claims that she placed him on grievance restriction, thereby violating his First Amendment rights, and denied his request for Kosher meals and to participate in Passover

in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the First Amendment's Free Exercise Clause. (*See generally* Mot. 1.) She argues that his claim related to the grievance restriction fails on the merits and that he did not exhaust his claims related to religious practice. Plaintiff filed a short response. (Resp. (Dkt. # 240).)

In the second motion, former Captain Daniel Stites, Lieutenant Brett Sundstrom, Lieutenant Clinton Moll, Sergeant Robert Ogawa, Sergeant Scott Lewis, and Sergeant Bernard Moody (collectively, "Defendants") move for summary judgment on Plaintiff's Fourteenth Amendment conditions of confinement claims against them. (*See generally* Mot. 2.) Specifically, Plaintiff brings a claim against Lt. Moll related to constant illumination and claims against Capt. Stites, Lt. Sundstrum, Sgt. Ogawa, Sgt. Lewis, and Sgt. Moody related to the condition of the showers. Defendants argue Plaintiff failed to exhaust these claims. Plaintiff did not file an opposition.

Having considered the motions for summary judgment and supporting evidence; Plaintiff's response brief; the reply briefs (dkt. ## 241, 280); Plaintiff's SAC, statement of claims, and relevant exhibits cited therein (*see* dkt. ## 27-2 – 27-9); and the governing law, the Court recommends that the motions for summary judgment be GRANTED.

## II.    BACKGROUND

### A.  Grievance Restriction

Plaintiff was booked into the SCJ on June 15, 2017 and was released to serve a prison sentence on January 29, 2019. (Parker Decl. 1 (Dkt. # 237) at ¶ 24.) Upon his arrival, he received a copy of the Inmate Handbook. (*Id.* at ¶ 6.) The Inmate Handbook states that when a prisoner needs to communicate with SCJ staff, he may communicate in writing by submitting a service or

1    medical "kite" form. (Inmate Handbook (Dkt. # 237-1) at 5.)[1] The modular deputy will either

2    answer the kite or route it to the appropriate staff member. (*Id.*) Staff generally respond to kites

3    by writing on the bottom of the form and returning the form to the inmate. (Parker Decl. 1 at ¶

4    7.)

5    　　　　If an inmate has a complaint about facility conditions or an action by a staff member that

6    the inmate has been unable to resolve by communicating informally with staff, the inmate may

7    file a written grievance on a form provided by the SCJ. (*Id.* at ¶ 9; *see also* Inmate Handbook at

8    12.) The grievance procedure is detailed in the Inmate Handbook. (*See* Parker Decl. 1 at ¶ 9;

9    Inmate Handbook at 12.) Ordinarily, a grievance goes to a first line supervisor (Parker Decl. at 1

10   ¶ 10), who will respond "in a timely manner, unless extenuating circumstances exist" (Inmate

11   Handbook at 12). An inmate may appeal a grievance decision "if there is new information

12   regarding the issue; or there is a possible error." (*Id.*) Appeals are handled by command staff and

13   a final decision on a grievance is rendered by either a major or the Bureau Chief. (Parker Decl. 1

14   at ¶ 10; Stites Decl. 1 (Dkt. # 238) at ¶ 16.)

15   　　　　When a grievance or appeal is submitted, a specialist in the Classification Unit logs in the

16   date and time in a database, scans the inmate's submission into the system, and then routes the

17   grievance or appeal to the appropriate staff member. (Parker Decl. 1 at ¶ 11.) Grievances take

18   anywhere from five minutes to several hours to respond to, depending on the type of complaint

19   an inmate raises and the research required to respond. (*Id.* at ¶ 16; Stites Decl. 1 at ¶ 19.) SCJ

20   staff tasked with responding to a grievance must take time away from their primary function—

21   keeping inmates, staff, and others who work in and with the SCJ safe—to respond to the

22   grievance. (Parker Decl. 1 at ¶ 17; Stites Decl. 1 at ¶ 20.)

23

---

[1] For ease of reference, the Court cites to the CM/ECF page numbers.

REPORT AND RECOMMENDATION - 3

1    Plaintiff submitted a total of 11 grievances between July 4, 2017, and November 26,

2    2017. (Parker Decl. 1 at ¶ 13.) Between December 1, 2017, and December 21, 2017, he

3    submitted 31 grievances. (*Id.*) Many were repetitive, including multiple grievances complaining

4    about the contents of his soy-free meals and repetitive grievances about how he was classified

5    and assigned to housing units within the SCJ. (*Id.* at ¶ 13; Stites Decl. 1 at ¶ 22; *see also* Parker

6    Decl. 1, Ex. C (Dkt. # 237-3).) Plaintiff also submitted grievances before attempting to

7    informally resolve the issue with staff. (Parker Decl. 1 at ¶ 14; Stites Decl. 1 at ¶ 17.)

8    Given Plaintiff's voluminous and repetitive grievances, Ms. Parker, the Classification

9    Unit Supervisor, consulted with Capt. Stites. (Parker Decl. 1 at ¶ 18; Stites Decl. 1 at ¶ 21.) Ms.

10   Parker and Capt. Stites determined Plaintiff was abusing the grievance system by not making

11   attempts to resolve his complaints with custody staff or other employees prior to filing

12   grievances, as required by the Inmate Handbook. (Parker Decl. 1 at ¶ 19; Stites Decl. 1 at ¶ 23.)

13   In addition, they considered the volume and repetitive nature of the grievances, as well as the

14   numerous warnings provided to Plaintiff about attempting to resolve his complaints before filing

15   grievances and to refrain from filing repetitive grievances because he disagreed with the

16   response. (Parker Decl. 1 at ¶ 19; Stites Decl. 1 at ¶ 23.) Capt. Stites made the ultimate decision

17   to limit Plaintiff to filing three grievances in a week. (Parker Decl. 1 at ¶ 20; Stites Decl. 1 at ¶

18   24.) In making that determination, they considered whether different or additional restrictions

19   would encourage Plaintiff to follow the directive that inmates attempt to resolve complaints with

20   SCJ staff prior to filing a grievance. (Parker Decl. 1 at ¶ 21; Stites Decl. 1 at ¶ 25.) They

21   determined that limiting the number of grievances to three per week would have the best impact

22   on the time and resources SCJ staff members were expending responding to Plaintiff's

23

REPORT AND RECOMMENDATION - 4

grievances. (Parker Decl. 1 at ¶ 21; Stites Decl. 1 at ¶ 25.) On December 21, 2017, Ms. Parker

sent Plaintiff a memorandum that stated:

> This memo is regarding your ongoing abuse of the grievance system. It has been
> established that you are abusing the grievance system. It is apparent that you had
> made no efforts to solve the issues to which you seek redress. This is evident by:
>
> - The volume of grievances you file.
> - The repetitive nature of these grievances.
>
> It is evident that you are intent on continuing this abuse of the system and that
> standard corrective and disciplinary measures will not be successful in stopping
> this abuse. Therefore effective immediately, your access to grievance forms will
> be limited to 3 per week. These forms will be issued to you by classification staff
> each Tuesday and will be your total allotment of grievance forms for the week.

(Parker Decl. 1, Ex. D (Dkt. # 237-4).)

In his SAC, Plaintiff alleges that after he was moved to segregation on November 17,

2017, he "started to file kites and grievances about the current living conditions, Max Status, and

all other issues that are problems here at the SCJ." (Claims at 51.) Plaintiff attaches to his SAC

copies of many of the grievances and appeals he filed. (Claims at 53 (citing SAC Exhibits 62-

65).) He notes that he was never infracted for filing any frivolous grievance and claims that all

the issues he raised were legitimate. (*Id.*) According to Plaintiff, Ms. Parker placed him on

grievance restriction only so the SCJ would not be held accountable and would not have to

correct the issues he raised. (*Id.*) Plaintiff alleges Ms. Parker improperly attempted to stop his

good faith use of the grievance system. (*Id.*)

### B. Passover Participation and Kosher Meals

On July 3, 2017, Plaintiff submitted a kite to the SCJ's Classification Unit asking to be

approved for a kosher diet. (Parker Decl. 1 at ¶ 26; *see also id.*, Ex. E (Dkt. # 237-5).) This was

Plaintiff's first request for Kosher meals in many years of bookings at the SCJ. (*Id.* at ¶ 25.) Ms.

Parker responded by memorandum, advising Plaintiff that the SCJ approves Kosher diets only

1    for inmates who practice the Jewish faith, and therefore, Plaintiff would have to complete the

2    Jewish Prisoner Services International ("JPSI") intake form before he could be approved for

3    Kosher meals. (*Id.* at ¶ 27; *see also id.*, Ex. F (Dkt. # 237-6).) Plaintiff did not return the intake

4    form or respond to Ms. Parker's memorandum. (*Id.* at ¶ 28.)

5         On July 16, 2017, Plaintiff submitted a second kite asking to receive a Kosher diet. (*Id.* at

6    ¶ 29; *see also id.*, Ex. G (Dkt. # 237-7).) He stated that he had started the conversion process in

7    2012 and asked that Classification or the Chaplain/Religious Services check with other

8    correctional facilities to verify that he selected a Kosher diet at other institutions. (*Id.*, Ex. G.) In

9    response, Ms. Parker reminded Plaintiff to return the JPSI intake form and provided additional

10   information about how Plaintiff could support his request for a Kosher diet. (*Id.*) Plaintiff did not

11   return the completed form or provide any additional information to support his request to be

12   approved for Kosher meals. (*Id.* at ¶¶ 30, 32.)

13        Ms. Parker received no further communication from Plaintiff about his request for a

14   Kosher diet until March 5, 2018, when he submitted a third kite stating he would like to be

15   allowed to participate in "Passover Observances and celebrate the traditional Passover week and

16   diet for that observance." (*Id.* at ¶ 30; *see also id.*, Ex. H (Dkt. # 237-8).) Ms. Parker responded

17   that Plaintiff was not authorized a religious diet based on prior communications on the issue. (*Id.*

18   at ¶ 30, Ex. H.) Plaintiff never followed up on the March 5, 2018 kite and did not file any

19   grievances based on Ms. Parker's response to his kite. (*Id.* at ¶¶ 33, 35.)

20        In his SAC, Plaintiff alleges that he is not Jewish but follows "this religion to some

21   degree." (Claims at 81.) He alleges that when he first arrived at the SCJ, he asked to be allowed

22   Kosher meals but was denied. (*Id.*) He also alleges that he asked to be allowed to observe

23   Passover, as he has been doing for the last ten years, but Ms. Parker denied his request. (*Id.*)

1

### C. Constant Illumination

2        All the cells at the SCJ have some type of 24-hour-a-day illumination. (Stites Decl. 2

3    (Dkt. # 251) at ¶ 14.) This is because corrections deputies at the SCJ check on inmates several

4    times each night for security reasons and for the welfare of the inmates. (*Id.*) In the 4-North

5    housing module, where Plaintiff was housed at the time he complained of constant illumination,

6    cells are equipped with both a brighter light for general illumination during the day and a dim

7    light for night hours. (*Id.* at ¶ 10.) Prior to November 14, 2017, there was a period of time when

8    the night setting was malfunctioning, and the lights remained on day setting at all hours. (*Id.*) On

9    November 14, 2017, the night setting was repaired. (*Id.*) Thereafter, custody deputies assigned to

10   the module adopted a practice of turning on the night setting at around 10:30 p.m. and returning

11   to day setting at around 5:30 a.m. when breakfast was served. (*Id.* at ¶ 11.) If inmates wished to

12   sleep during day hours or if the night setting was not dark enough, they were permitted to cover

13   their faces with a t-shirt or blanket to completely block out the light. (*Id.*)

14       On November 17, 2017, Plaintiff was assigned to the 4-North housing module. (*Id.* at ¶

15   9.) On November 26, 2017, Plaintiff submitted Grievance # 1126, which complained that the

16   deputy who was on duty that night had refused to dim the lights. (Dkt. # 27-9 at 37.) SCJ staff

17   responded that the issue had been reported up the chain of command and that changes would be

18   made to correct the issue. (*Id.*) There is no evidence Plaintiff appealed this response.

19       On December 19, 2017, Plaintiff submitted Grievance # 1248, which complained that

20   most deputies left the night setting on until around 11:00 a.m., but Deputy Adepoju turned the

21   day lights on at 5:00 a.m. "for no reason." (Dkt. # 27-8 at 13; *see also* Parker Decl. 2 (Dkt. #

22   250) at ¶ 9.) On December 22, 2017, Lt. Moll responded. (Dkt. # 27-8 at 13; *see also* Moll Decl.

23

(Dkt. # 247) at ¶¶ 9-17 (explaining grievance response); Parker Decl. 2 at ¶ 9.) Plaintiff did not appeal this response. (Parker Decl. 2 at ¶¶ 8-10.)

On December 21, 2017, Plaintiff submitted Grievance # 1267, which complained about headaches from the lighting and asked to see a medical provider. (Dkt. # 27-8 at 40.) On December 28, 2017, a SCJ nurse responded that Plaintiff was started on Tylenol on December 26, 2017. (*Id.*) There is no evidence Plaintiff appealed this response.

In his SAC, Plaintiff alleges that since he was transferred to 4-North on November 17, 2017, the lights have been on 24 hours per day. (Claims at 77.) He alleges that he suffered headaches and difficulty sleeping as a result of the constant illumination. (*Id.*) He complains that Lt. Moll's response to Grievance # 1248 did not provide him the relief he sought. (*Id.*) He cites several exhibits to his SAC. (*Id.* (citing SAC Exhibits 37, 59, 69, 77).) SAC Exhibit 37 includes several medical-related grievances, none of which are appeals related to constant illumination. (*See* Dkt. # 27-7 at 17-24.) SAC Exhibits 59, 69, and 77 are copies of Grievance ## 1248, 1267, and 1126, discussed above. (Dkt. # 27-8 at 13, 40; Dkt. # 27-9 at 37.)

### D. Condition of Showers

SCJ inmates who are classified to conduct cleaning work perform the majority of the cleaning in the housing areas, including the showers in 4-North. (Stites Decl. 2 at ¶ 5.) In December 2017, Plaintiff talked to several SCJ staff about the condition of the showers, which he believed presented a health hazard due to the bacteria and mold that was growing. (*See* Dkt. # 27-9 at 52 (Grievance # 1252).) He raised the issue directly with Lt. Sundstrom, Sgt. Moody, and Sgt. Lewis. (Sundstrom Decl. (Dkt. # 252) at ¶ 6; Moody Decl. (Dkt. # 248) at ¶ 7; Lewis Decl. (Dkt. # 246) at ¶ 3.) He also submitted Grievance # 1252 on December 19, 2017, raising his issues. (Dkt. # 27-9 at 52.) On December 22, 2017, Sgt. Ogawa responded that staff would have

the cleaners focus on the showers. (*Id.*; *see also* Ogawa Decl. (Dkt. # 249) at ¶ 6.) Sgt. Ogawa contacted the custody deputy to advise the cleaners to focus on the 4-North showers and clean them to an acceptable level. (Ogawa Decl. at ¶ 7.) Lt. Sundstrom and Sgt. Moody also directed custody staff to ensure inmate workers cleaned the showers. (Sundstrom Decl. at ¶ 6; Moody Decl. at ¶ 7.)

On December 29, 2017, Plaintiff filed a second grievance, Grievance # 1308, complaining about the showers. (Dkt. # 27-7 at 25.) Before SCJ staff responded to the second grievance, Sgt. Lewis approached Plaintiff to discuss his complaint. (Lewis Decl. at ¶ 3.) Sgt. Lewis was not responding directly to a kite or grievance but had learned of Plaintiff's complaints about the showers while addressing other issues Plaintiff had raised. (*Id.*) To address Plaintiff's concerns, Sgt. Lewis stood by in the 4-North shower area while inmate workers cleaned the showers. (*Id.* at ¶ 4.) He directed the inmate workers to focus on certain areas that needed deep cleaning and special attention. (*Id.*) He waited and watched as the inmate workers addressed and cleaned all the areas of the showers about which Plaintiff complained. (*Id.*) When the inmate workers were finished, the showers were cleaned to what Sgt. Lewis considered an acceptable level. (*Id.*) This cleaning was accomplished by January 1, 2018. (*Id.* at ¶ 7.) Sgt. Lewis did not receive any further complaints from Plaintiff regarding the showers. (*Id.* at ¶¶ 6, 8.)

Plaintiff never appealed the Sgt. Ogawa's response to Grievance # 1252. (*See* Parker Decl. 2 at ¶ 12.) Likewise, there is no evidence that Plaintiff appealed the SCJ's response to Grievance # 1308.

In his SAC, Plaintiff alleges that he spoke with numerous SCJ employees about the condition of the showers. (Claims at 89.) Plaintiff alleges that the inmate workers were not given enough time to properly clean the showers and that there was a thick growth of fungus and

bacteria, which Plaintiff feared would give him an infection. (*Id.*) Plaintiff alleges Sgt. Moody shut down the showers for cleaning, but they were still not cleaned properly and the bacteria and fungus continued to get worse. (*Id.*)

### E.  Procedural History

Plaintiff initiated this action *pro se* in December 2017, seeking to bring claims against 53 defendants. (Dkt. # 1.) Upon screening, the Honorable James P. Donohue declined to serve the complaint and granted Plaintiff leave to amend. (Dkt. # 15.) Judge Donohue declined to serve Plaintiff's amended complaint, as well. (Dkt. ## 18, 25.) After Plaintiff filed his verified SAC, Judge Donohue issued a Report and Recommendation, recommending that some claims and defendants be dismissed and that others be allowed to go forward. (Dkt. ## 27, 39, 41.) The Honorable John C. Coughenour adopted the Report and Recommendation. (Dkt. # 44.) Judge Donohue directed that the SAC be served on the remaining 26 defendants, and the defendants timely answered. (Dkt. ## 49, 101, 102.) Judge Donohue subsequently set discovery and dispositive motions deadlines. (Dkt. # 103.) Primarily due to Plaintiff's transfers between institutions, the deadlines were extended several times and finally set for November 18, 2019, and December 18, 2019, respectively. (Dkt. # 227; *see also* Dkt. ## 197, 218.)

Prior to the expiration of these deadlines, Deputies John Hatchell, Collins Machyo, and Elias Chavez moved for summary judgment. (Dkt. ## 192 (Hatchell Mot.), 193 (Machyo/Chavez Mot.).) In October 2019, Judge Coughenour adopted the recommendation of the undersigned that Deputy Hatchell's motion be granted and that Deputies Machyo and Chavez's motion be granted in part and denied in part. (Dkt. # 234.) Specifically, Judge Coughenour denied the motion for summary judgment as to Plaintiff's Fourteenth Amendment failure to protect claim against Deputy Machyo. (*Id.*)

On October 31, 2019, Ms. Parker moved for summary judgment on the two claims against her. (Mot. 1.) Plaintiff filed a two-page response, stating that he "strongly" opposes summary judgment and that "all the evidence and argument has been submitted to this Court over the last 22 months to prove my case." (Resp. at 2.) Plaintiff asked that the motion for summary judgment be denied and that a trial date be set. (*Id.* at 3.) Ms. Parker timely filed a reply. (Dkt. # 241.)

On November 27, 2019, Defendants moved for summary judgment on the conditions of confinement claims against them.[2] (Mot. 2.) Plaintiff did not file a response. Defendants timely filed a reply. (Dkt. # 280.)

On December 18, 2019, the remaining defendants filed two motions for summary judgment. (Dkt. ## 256, 264.) Plaintiff did not file a timely response. The defendants filed reply briefs noting Plaintiff's failure to oppose their motions. (Dkt. ## 282, 283.) Five days after the noting date, Plaintiff filed a letter indicating that he did not receive the December 18, 2019 motions and supporting evidence until the noting date and asking that the Court deny the motions. (Dkt. # 284.) To give Plaintiff an opportunity to file substantive oppositions, the Court has re-noted the motions filed December 18, 2019, for April 13, 2020. (Dkt. # 285.)

## III.    LEGAL STANDARDS

### A.  Summary Judgment Standard

Summary judgment is appropriate when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or

---

[2] Defendants explain that due to the number of individual defendants and the different subject matters of Plaintiff's claims, they are moving for summary judgment on claims by subject matter, rather than by defendant. (Mot. 2 at 1 n.1.)

whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

The moving party bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by presenting evidence that negates an essential element of the nonmoving party's case, or by establishing that the nonmovant lacks the quantum evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute. *Id.* at 252. In addition, it is the nonmoving party's responsibility to "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted source omitted). The Court need not "scour the record in search of a genuine issue of triable fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, and may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S. at 248; *see*

1  *also Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (district court cannot

2  disregard evidence at the summary judgment stage solely based on its self-serving nature, even if

3  it is uncorroborated, unless it "states only conclusions and not facts that would be admissible in

4  evidence" (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir.

5  2002) (district court properly disregarded the declaration that included facts beyond the

6  declarant's personal knowledge and did not indicate how she knew the facts to be true); *F.T.C. v.*

7  *Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving

8  affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine

9  issue of material fact."))).

10      A verified complaint, like Plaintiff's SAC, "may be treated as an affidavit to oppose

11  summary judgment to the extent it is based on personal knowledge and sets forth specific facts

12  admissible in evidence." *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (internal

13  quotations omitted); *see also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Lopez v.*

14  *Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). But allegations that are based merely

15  on Plaintiff's belief are insufficient to oppose summary judgment, as are unsupported conjecture

16  and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir.

17  2003); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

18      **B.  Section 1983 Claims**

19      To sustain a § 1983 civil rights claim, Plaintiff must show (1) he suffered a violation of

20  rights protected by the Constitution or created by federal statute, and (2) the violation was

21  proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48

22  (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong,

23  Plaintiff must allege facts showing how individually named defendants caused or personally

1    participated in causing the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355

2    (9th Cir. 1981).

3                           **IV.    DISCUSSION**

4            At issue is whether (1) Plaintiff exhausted his religion-based claims against Ms. Parker

5    and his conditions of confinement claims against Defendants, and (2) Ms. Parker is entitled to

6    summary judgment on Plaintiff's grievance restriction claim. Plaintiff's response brief did not

7    make any specific argument or identify any particular evidence in the record to refute Ms.

8    Parker's and Defendants' claims. (*See* Resp.) Given the number of filings in the record, the Court

9    declines to "scour the record" for facts that favor Plaintiff and looks only to his verified SAC,

10   statement of claims, and the exhibits referenced therein that are relevant to the claims at issue

11   here. *Keenan*, 91 F.3d at 1279. Viewing the evidence in the light most favorable to Plaintiff, the

12   Court concludes that he failed to exhaust his religion and conditions of confinement claims, and

13   that the grievance restriction did not violate his First Amendment rights.[3]

14           **A. Exhaustion**

15           Under the Prison Litigation Reform Act ("PLRA"), a prisoner must exhaust "available"

16   administrative remedies before filing suit. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Albino v.*

17   *Baca*, 747 F.3d 1162, 1165 (9th Cir. 2014) (en banc); 42 U.S.C. § 1997e(a) ("No action shall be

18   brought with respect to prison conditions under section 1983 of this title, or any other Federal

19   law, by a prisoner confined in any jail, prison, or other correctional facility until such

20   administrative remedies as are available are exhausted."). The exhaustion requirement "applies

21   to all inmate suits about prison life, whether they involve general circumstances or particular

22   episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534

23   _____

[3] Given these conclusions, the Court does not discuss the alternative bases for summary judgment that Ms. Parker and Defendants raise in their motions.

REPORT AND RECOMMENDATION - 14

U.S. 516, 532 (2002). Even when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is still a prerequisite to suit. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Exhaustion must be proper, meaning that the prisoner must complete the administrative review process in accordance with the applicable rules. *Woodford*, 548 U.S. at 92-95.

Defendants bear the initial burden of showing that there was an available administrative remedy and that Plaintiff did not exhaust that remedy. *Albino*, 747 F.3d at 1169, 1172. Once that showing is made, the burden shifts to Plaintiff, who must either demonstrate that he, in fact, exhausted administrative remedies or "come forward with evidence showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172; *see also Ross v. Blake*, 136 S. Ct. 1850 (2016) (setting forth examples of when administrative remedies would be unavailable). The ultimate burden, however, rests with Defendants. *Albino*, 747 F.3d at 1172.

Summary judgment is appropriate if the undisputed evidence, viewed in the light most favorable to Plaintiff, shows a failure to exhaust. *Id.* at 1166, 1168; Fed. R. Civ. P. 56(a). If administrative remedies have not been exhausted at the time an action is brought, the action must be dismissed without prejudice. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002) (per curiam); *see also Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled on other grounds by Albino*, 747 F.3d at 1162 ("If the district court concludes that the prisoner has not exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice."); *Carrea v. California*, 551 Fed. Appx. 368, 369 (9th Cir. 2014) (remanding for the entry of dismissal without prejudice because that is the proper remedy for a failure to exhaust).

In this case, proper exhaustion of a grievance requires the inmate to file an appeal of the SCJ's grievance response. (*See* Parker Decl. 1 at ¶¶ 6, 9; Stites Decl. 1 at ¶¶ 15-16; Inmate Handbook at 12.) Plaintiff appealed many grievance responses, thereby demonstrating that he understood the administrative process and that it was generally available to him. (*See, e.g.*, Dkt. # 27-8 at 30, 33, 53; Dkt. # 27-9 at 1, 3, 15, 23, 30.) However, as discussed above, Plaintiff never submitted a grievance regarding his desire to participate in Passover and receive Kosher meals, and he never appealed the SCJ's responses to his grievances regarding the lighting and the showers. Defendants, therefore, have satisfied their initial burden of showing that administrative remedies were available and that Plaintiff did not exhaust these claims. Plaintiff did not file a substantive response, and therefore he has not shown that he in fact exhausted his remedies or that there was "something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that summary judgment based on a failure to exhaust is appropriate for his religion-based claims against Ms. Parker and his conditions of confinement claims against Defendants.

## B. Grievance Restriction

As noted above, Plaintiff brings a First Amendment claim against Ms. Parker for placing him on grievance restriction, alleging that he raised only legitimate issues and that Ms. Parker placed him in grievance restriction so the SCJ would not have to correct the issues he raised. Ms. Parker argues that she is entitled to summary judgment because the decision to limit him to three grievances per week was reasonable and did not violate his constitutional rights given that he abused the grievance system by filing an excessive number of grievances, many of which were

1  repetitive, and by failing to attempt to resolve his complaints before submitting grievances. (Mot.

2  1 at 18.)

3       Prisoners have a First Amendment right to meaningfully access the courts and to file

4  prison grievances. *See Lewis v. Casey*, 518 U.S. 343, 361-62 (1996); *Rhodes v. Robinson*, 408

5  F.3d 559, 567 (9th Cir. 2005). They do not, however, have a standalone due process right to a

6  particular administrative grievance process. *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988);

7  *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Allen v. Wood*, 970 F. Supp. 824, 832

8  (E.D. Wash. 1997); *Stewart v. Block*, 938 F. Supp. 582, 588 (C.D. Cal. 1996). Policies and

9  regulations that impinge on the First Amendment rights of prisoners may be upheld if they are

10  reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89 (1987)

11  (setting forth four-factor test to determine whether such policies and regulations should be

12  upheld); *see also Beard v. Banks*, 548 U.S. 521, 529 (2006). The factors the Court considers are:

13  (1) whether there is a valid, rational connection between the regulation and the interest used to

14  justify the regulation; (2) whether prisoners retain alternative means of exercising the right at

15  issue; (3) the impact the requested accommodation will have on prisoners, prison staff, and

16  prison resources generally; and (4) whether the prisoner has identified easy alternatives to the

17  regulation that could be implemented at a minimal cost to legitimate penological interests.

18  *Turner*, 482 U.S. at 89-91. Courts "must accord substantial deference to the professional

19  judgment of prison administrators, who bear a significant responsibility for defining the

20  legitimate goals of a corrections system and for determining the most appropriate means to

21  accomplish them." *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003); *see also Florence v. Bd. of

22  Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 322-23 (2012) ("courts must defer to

23  the judgment of correction officials unless the record contains substantial evidence showing their

1    policies are an unnecessary or unjustified response to problems of jail security"). The burden is

2    not on the state to prove the validity of a challenged regulation but is instead on the inmate to

3    disprove it. *Overton*, 539 U.S. at 132.

4         The first factor is the most important. *Prison Legal News v. Lehman*, 397 F.3d 692, 699

5    (9th Cir. 2005). Ms. Parker and Capt. Stites attest that they limited the number of grievances

6    Plaintiff could file because he was abusing the grievance system and overly burdening staff, who

7    were required to take time away from their primary function of assuring the safety of those in the

8    SCJ to respond to his grievances. (*See* Parker Decl. 1 at ¶¶ 15-17, 19-21; Stites Decl. 1 at ¶¶ 17-

9    21, 23-25.) Their goal was to encourage Plaintiff to attempt to resolve his issues informally

10   before submitting a grievance, as outlined in the Inmate Handbook. (*See* Parker Decl. 1 at ¶¶ 15-

11   17, 19-21; Stites Decl. 1 at ¶¶ 17-21, 23-25.) Plaintiff's claim that he raised only legitimate

12   issues does not create a genuine issue of material fact regarding whether he was abusing the

13   grievance system; it is conclusory, *Hernandez*, 343 F.3d at 1112 (conclusory statements are

14   insufficient to defeat properly supported motion for summary judgment), and even legitimate

15   issues can be raised in an abusive manner, *i.e.*, by submitting grievances before attempting to

16   resolve the issues informally and/or by submitting repetitive grievances. Furthermore, Plaintiff's

17   claim that Ms. Parker placed him on grievance restriction so the SCJ would not be held

18   accountable appears to be based on unsupported conjecture and therefore fails to create a genuine

19   dispute of material fact. *See id.* (unsupported conjecture insufficient to defeat properly supported

20   motion for summary judgment). Ms. Parker has presented a valid, rational connection between

21   the grievance restriction and the legitimate interests of the SCJ in managing staff resources and

22   encouraging Plaintiff to comply with the established grievance procedures. *See Procunier v.*

23   *Martinez*, 416 U.S. 396, 413 (1974), *overruled on other grounds by Thornburgh v. Abbott*, 490

1    U.S. 401, 413-14 (1989) (legitimate penological interests include "security, order, and

2    rehabilitation").

3            The second *Turner* factor asks whether prisoners have alternative means of exercising the

4    right at issue. *See Turner*, 482 U.S. at 90. In this case, the grievance restriction did not deprive

5    Plaintiff of his First Amendment right to file grievances; it merely limited that right. The

6    restriction also did not limit his right to access the courts as he filed several cases while he was

7    on grievance restriction. *See Brennan v. Spaetig*, No. C18-329-RAJ, Dkt. 1 (W.D. Wash. Mar. 5,

8    2018); *Brennan v. Estrada*, No. C18-417-RSM, Dkt. 1 (W.D. Wash. Mar. 19, 2018); *Brennan v.*

9    *Mitchell*, No. C18-624-RAJ, Dkt. 1 (W.D. Wash. Apr. 30, 2018).

10           The third *Turner* factor considers the impact on the prisoner and prison staff. *Turner*, 482

11   U.S. at 90. As noted, the grievance restriction limited Plaintiff to three grievances per week.

12   With respect to the impact on SCJ staff, Ms. Parker has presented evidence that grievances take

13   anywhere from five minutes to several hours to respond to, depending on the type of complaint

14   an inmate raises and the research required to respond. (Parker Decl. 1 at ¶ 16.) SCJ staff must

15   take time away from their primary function, ensuring safety, to respond to grievances. (*Id.* at ¶

16   17.) Based on this evidence, the Court concludes that reducing the number of grievances,

17   particularly those that are repetitive or premature because the inmate has not attempted to

18   informally resolve the issue, allows for the more efficient use of SCJ resources.

19           As to the fourth *Turner* factor, Plaintiff has not specifically identified any alternative

20   regulation that would have minimal impact on the SCJ's resources. *See Turner*, 482 U.S. at 90-

21   91. Presumably, Plaintiff might argue that Ms. Parker and Capt. Stites could have allowed him to

22   file more than three grievances in any one week. Ms. Parker, however, has attested that in her

23   experience, three grievances or more per week is an excessive number of formal grievances and

1    burdens staff time and resources. (Parker Decl. 1 at ¶ 15.) Therefore, such an alternative would

2    not have been implemented at minimal cost to the SCJ's legitimate penological interests.

3            Having considered the four *Turner* factors, the Court concludes that Ms. Parker has

4    established that the grievance restriction was reasonably related to the legitimate interests of

5    managing staff resources and encouraging Plaintiff to comply with the established grievance

6    procedures. Plaintiff fails to create a genuine issue of material fact on this issue or otherwise

7    satisfy his burden of showing that the regulation was invalid. As a result, Ms. Parker is entitled to

8    summary judgment on Plaintiff's First Amendment claim against her.

9                            **V.      CONCLUSION**

10           The Court recommends that (1) Ms. Parker's motion for summary judgment (dkt. # 236)

11   be GRANTED, that Plaintiff's claims regarding religion be DISMISSED without prejudice for

12   failure to exhaust, and that his claim regarding the grievance restriction be DISMISSED with

13   prejudice; and (2) Defendants' motion for summary judgment regarding conditions of

14   confinement (dkt. # 244) be GRANTED and that Plaintiff's claims regarding conditions of

15   confinement be DISMISSED without prejudice for failure to exhaust. Granting these motions

16   disposes of all the claims against Ms. Parker, Capt. Stites, Lt. Sundstrom, Sgt. Ogawa, Sgt.

17   Lewis, and Sgt. Moody, and these Defendants should be dismissed from the lawsuit. There

18   remains another claim against Lt. Moll that will be addressed in a subsequent order. A proposed

19   order accompanies this Report and Recommendation.

20           Objections to this Report and Recommendation, if any, should be filed with the Clerk and

21   served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

22   and Recommendation is signed. Failure to file objections within the specified time may affect

23   your right to appeal. Objections should be noted for consideration on the District Judge's

motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on May 1, 2020.

Dated this 8th day of April, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge