1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

RONALD BRENNAN JR.,

               Plaintiff,

    v.

ANTHONY ASTON, et al.,

               Defendants.

Case No. 17-1928-JCC-MLP

REPORT AND RECOMMENDATION

## I.      INTRODUCTION

Plaintiff, a state prisoner who is proceeding *pro se* and *in forma pauperis*, initiated this 42 U.S.C. § 1983 civil rights action while he was a pretrial detainee at the Snohomish County Jail ("SCJ"). In his verified second amended complaint ("SAC") and statement of claims ("Statement"), he brings numerous claims against over 20 SCJ employees. (SAC (Dkt. # 27); Statement (Dkt. # 27-1).) Currently before the Court are two motions for summary judgment. (Mot. 1 (Dkt. # 256); Mot. 2 (Dkt. # 264).)

In the first motion, Nurse Debbie Bellinger, Mental Health Professional ("MHP") Bradley Hoover, MHP Jacob Taylor, MHP Mirra Merkel, Classification Specialist Charles Mitchell, and Classification Specialist Alexis Wafstet seek summary judgment on Plaintiff's

medical care claims against Nurse Bellinger, MHP Hoover, MHP Taylor, and MHP Merkel, and his failure to protect claims against MHP Hoover, Classification Mitchell, and Classification Wafstet. With respect to the medical care claims, Defendants argue that they were not deliberately indifferent to a serious medical need. Defendants also argue that there is insufficient evidence to support Plaintiff's failure to protect claims. To the extent there is any question Defendants violated Plaintiff's constitutional rights, they argue that they are entitled to qualified immunity. Finally, Defendants contend that Plaintiff cannot recover monetary damages under the Prison Litigation Reform Act ("PLRA") because he did not suffer a physical injury.

The second motion is brought by 11 Defendants against whom Plaintiff alleges First Amendment retaliation claims: Lieutenant Clinton Moll and Custody Deputies Stuart Nicholas, Olufemi Adepoju, Susan Freeman, John Gross, Paul Hansen, William Hart, Sherell Hovey, Benjamin Ohipeni, Brian Wilson, and Jon Crew. Custody Deputy Crew also seeks summary judgment on Plaintiff's Washington State battery claim against him. Defendants raise several arguments in support of summary judgment, including that Plaintiff failed to exhaust his administrative remedies for some claims, that other claims fail as a matter of law, that they are entitled to qualified immunity, and that Plaintiff cannot recover monetary damages due to the PLRA's physical injury requirement.

Five days after the motions were originally noted, Plaintiff filed a brief response opposing summary judgment and indicating that he did not receive the motions until the noting date. (Resp. (Dkt. # 284).) Out of an abundance of caution, the Court re-noted the motions to allow Plaintiff time to file a proper response. (*See* Dkt. # 285.) Plaintiff, however, did not file anything further.

Having considered the motions for summary judgment and supporting evidence; Plaintiff's response brief; Defendants' reply briefs (dkt. ## 282, 283); Plaintiff's SAC, Statement, and the relevant exhibits cited therein (*see* dkt. ## 27-2 – 27-9); Plaintiff's motion to supplement (Supp. (dkt. # 39)), and the relevant exhibits cited therein (*see* dkt. # 39-2); and the governing law, the Court recommends that Defendants' first motion for summary judgment be GRANTED and that Defendants' second motion for summary judgment be GRANTED in part and DENIED in part. Specifically, summary judgment should be denied as to Plaintiff's retaliation claims against Custody Deputies Nicholas and Crew, and Plaintiff's state law battery claim against Custody Deputy Crew, but granted in all other respects.

## II.    BACKGROUND

### A.  Medical Care Claim against Nurse Bellinger

Plaintiff alleges that he has been hospitalized on two occasions due to Deep Vein Thrombosis ("DVT") and was told in 2016 that he should be on blood thinners for the rest of his life. (Statement at 95, 97.) Plaintiff alleges that when he was booked into the SCJ in June 2017, he informed the SCJ medical staff of his health history and prescription medications, including Warfarin to treat blood clots, but it took over three weeks for him to be evaluated and started on the medication. (*Id.* at 97.) Plaintiff also alleges that SCJ medical staff improperly managed his medication for blood clots, so he stopped taking it in August 2017. (*Id.*; *see also* Dkt. 27-7 at 18.) Plaintiff does not claim Nurse Bellinger was involved in his initial care or the improper management of his medication.

Plaintiff alleges that on November 28, 2017, he began experiencing symptoms of blood clotting and had to file over 40 kites and grievances with the SCJ medical department before his

1   medication was reinstated.[1] (*See* Statement at 97, 99; Bellinger Decl. (Dkt. # 257) at 7.) Nurse

2   Bellinger responded to three grievances related to this issue in December 2017. (*See* Statement at

3   99; Bellinger Decl. at ¶¶ 8-17, Ex. A.) Plaintiff takes issue with Nurse Bellinger's responses to

4   his grievances and claims she delayed his care until January 5, 2018, when he saw Dr. Stewart

5   Andrews, who resumed his medication. (Statement at 99.)

6          Defendants submit the following evidence in support of summary judgment. Plaintiff was

7   seen by ARNP Miller[2] on December 4, 2017, and his prescription for Warfarin was reinstated.

8   (Bellinger Decl. at ¶ 10.) On December 5, 2017, he had an ultrasound to confirm the need for

9   Warfarin. (*Id.*) ARNP Miller reviewed the results of the ultrasound and determined that it did not

10  call for blood thinners. (*Id.* at ¶ 11.) On December 6, 2017, Plaintiff's medication was stopped.

11  (*See id.* at ¶ 7.) On December 8, 2017, Plaintiff submitted a grievance asking that his medication

12  be reinstated. (*Id.*) On December 12, 2017, Nurse Bellinger responded that according to

13  Plaintiff's providers, his ultrasound was negative and blood thinners were not needed. (*Id.*)

14         On December 20, 2017, Plaintiff wrote two other grievances that were addressed by

15  Nurse Bellinger. (*Id.* at ¶¶ 8-9.) In the first, Plaintiff stated that on December 18, 2017, he sent a

16  kite asking to see a provider relating to the blood clotting issue and that the response was that he

17  "refused to get INR[3] on 12-8-2017 to rule out DVT." (*Id.* at ¶ 8.) Plaintiff complained in his

18  grievance that INR was not a test for blood clots, and he again asked to see a provider. (*Id.*) The

19  second December 20, 2017 grievance listed the numerous kites Plaintiff had sent that month

20

21  [1] Plaintiff does not allege when his symptoms began, but he claimed in a December 8, 2017 grievance that he began experiencing symptoms on November 28, 2017. (*See* Bellinger Decl. (Dkt. # 257) at 7.)

22  [2] ARNP Miller is not a defendant in this action.

23  [3] Neither party defines "INR," but it appears the acronym refers to "international normalized ratio." *See* Mayo Clinic, Prothrombin Test Time, https://www.mayoclinic.org/tests-procedures/prothrombin-time/about/pac-20384661 (last visited May 7, 2020).

1    outlining his symptoms related to blood clotting and asked to be seen by a provider. (*Id.* at ¶ 9.)

2    The grievance coordinator received both grievances on December 25, 2017. (*Id.* at ¶¶ 8-9.) On

3    December 28, 2017, Nurse Bellinger responded to the first grievance by reiterating that Plaintiff

4    had been seen on December 4, 2017, the ultrasound was normal, and medication was no longer

5    needed. (*Id.* at ¶ 8.) Nurse Bellinger responded to the second grievance by stating that it was

6    duplicative. (*Id.* at ¶ 9.)

7        On January 4, 2018, Plaintiff was seen by Dr. Andrews, who reinstated his medication.[4]

8    (*Id.* at ¶ 13; Statement at 99.) Nurse Bellinger did not treat Plaintiff for his concerns about

9    Warfarin, and her involvement was limited to responding to the three grievances described

10    above. (Bellinger Decl. at ¶¶ 15-16.)

11    **B.  Mental Health Care Claims Against MHPs Hoover, Taylor, and Merkel**

12        In his SAC, Plaintiff complains about the mental health care he received at the SCJ.

13    (Statement at 105-09.) He alleges that he has a long history of mental health issues, including

14    several suicide attempts, and that while at the SCJ, he suffered from paranoia, depression,

15    suicidal thoughts, and other thoughts of self-harm. (*Id.* at 109.) He alleges that he filed numerous

16    kites seeking mental health assistance, and only two were answered. (*Id.* at 105.) He alleges that

17    he appealed his placement in an individual cell, noting that long exposure to isolation can lead to

18    thoughts of self-harm, that MHP Hoover saw his complaint about his housing placement but did

19    not intervene, and that MHP Merkel did not respond until 13 days later that she was going to put

20    him on suicide watch. (*Id.*) Plaintiff alleges that MHP Merkel and MHP Hoover refused to come

21    to the segregation unit to see him and that they are not authorized to meet with him in the

22    medical department. (*Id.*)

23

---

[4] Dr. Andrews is not a defendant in this action.

Plaintiff alleges that on January 12, 2018, he attempted to speak with MHP Taylor, the lead MHP at the SCJ, about his lack of access to mental health treatment, but MHP Taylor did not have time and said he would return the following day. (*Id.* at 107.) However, MHP Taylor did not return until January 26, 2018, when Plaintiff was in court. (*Id.*) Plaintiff also alleges that on January 24, 2018, he asked to speak with MHP Hoover because his grandfather had just passed away, but MHP Hoover did not come to his cell door until February 2, 2018, and then only stayed for about five minutes. (*Id.*) Plaintiff complains that his placement in segregation "increased" his mental health issues and that he experienced daily thoughts of suicide and self-harm, as well as paranoia and depression. (*Id.* at 107-09.)

In support of summary judgment, Defendants submit the following evidence. The focus of the MHPs is on ensuring inmates are not at risk of physical harm based on acute mental disorders. (Taylor Decl. (Dkt. # 261) at ¶ 8.) MHPs do not conduct ongoing counseling treatment of inmates because inmates may be released from jail at any time. (*Id.*) MHPs are assigned to specific housing modules in the SCJ and make regular rounds through the modules to contact inmates who wish to speak with them. (*Id.* at ¶ 7.) MHPs document contacts and assessments of inmates' mental health status in the CorEMR medical record, including informal contacts that occur when making their rounds. (*Id.* at ¶ 9.)

During the period at issue in this lawsuit, Plaintiff was assigned to an individual cell in a maximum-security housing module. (*See id.* at ¶ 5.) Several SCJ staff members, including MHP Taylor, met weekly to discuss the conditions of confinement for maximum security inmates. (*Id.*) As such, Plaintiff's classification level and housing assignment were regularly reviewed by SCJ staff. (*Id.*)

Defendants' evidence specific to each MHP is discussed below.

1          *1.    MHP Hoover*

2          Plaintiff was seen on a number of occasions by MHP Hoover, who was assigned to his

3  housing module. (*Id.* at ¶ 11; Hoover Decl. (Dkt. # 258) at ¶¶ 2-3.) On December 5, 2017, MHP

4  Hoover spoke with Plaintiff in response to a kite he sent to the Mental Health Unit on December

5  1, 2017. (Hoover Decl. at ¶ 4; *id.* at 8 (excerpt from CorEMR medical record for Plaintiff).)

6  Plaintiff reported difficulty coping with being housed in isolation. (*Id.* at 8.) He also reported

7  ongoing auditory hallucinations that he attributed to his history of drug use along with

8  frustration. (*Id.*) Plaintiff advocated for less restrictive and more social housing. (*Id.*) Plaintiff

9  discussed the anniversary of his former partner's suicide. (*Id.*) Upon direct inquiry, Plaintiff

10 denied suicidal plans or intentions but acknowledged occasional thoughts he did not intend to act

11 upon. (*Id.*) MHP Hoover noted that Plaintiff was cooperative and did not present as hostile or

12 delusional. (*Id.*) MHP Hoover assessed Plaintiff's mental health treatment history and his stated

13 concerns and determined that his housing placement was appropriate and that he did not need to

14 be placed on suicide watch. (*Id.*; *id.* at ¶ 4.)

15         MHP Hoover next spoke with Plaintiff on December 11, 2017, while he was doing is

16 regular rounds through the module. (*Id.* at ¶ 5; *id.* at 8.) MHP Hoover noted that Plaintiff was

17 oriented, cooperative, and did not present as experiencing any mental health concerns. (*Id.* at 8.)

18 MHP Hoover inquired as to Plaintiff's wellbeing, and Plaintiff presented a letter and asked MHP

19 Hoover to deliver it to the SCJ Detention Manager, which MHP Hoover did. (*Id.*)

20         MHP Hoover next spoke with Plaintiff on January 17, 2018, during his module rounds.

21 (*Id.* at ¶ 6; *id.* at 9.) Plaintiff initiated a conversation with MHP Hoover. (*Id.* at 9.) Plaintiff did

22 not present as hostile, delusional, or responsive to internal stimuli or hallucinations. (*Id.* at 9.) In

23 response to questions from Plaintiff, MHP Hoover informed Plaintiff that he would continue to

assist with mental health concerns but would not perform unrelated administrative requests like delivering letters to non-MHP staff. (*Id.* at 9.)

MHP Hoover spoke with Plaintiff again on January 23, 2018, in response to a January 20, 2018 kite. (*Id.* at ¶ 7; *id.* at 9.) Plaintiff was cooperative and did not present as hostile, delusional, or responsive to internal stimuli or hallucinations. (*Id.* at 9.) Upon inquiry into his wellbeing, Plaintiff indicated that he did not want to speak openly in the module and presented MHP Hoover with a letter discussing his concerns. (*Id.*) MHP Hoover reviewed the letter and forwarded it to the appropriate staff member the same day. (*Id.*)

MHP Hoover next spoke with Plaintiff during his module rounds on January 29, 2018. (*Id.* at ¶ 8; *id.* at 9.) Plaintiff reported that his grandfather had passed away and spoke about how much his grandfather had meant to him. (*Id.* at 9.) Upon direct inquiry, Plaintiff denied that he was suicidal. (*Id.*)

MHP Hoover next spoke with Plaintiff on April 1, 2018, during his module rounds.[5] (*Id.* at ¶ 10; *id.* at 10.) Plaintiff was anxious and upset about a recent interaction with staff about laundry. (*Id.* at 10.) MHP Hoover determined that it was not necessary to change his housing placement or put him on suicide watch. (*Id.*)

MHP Hoover's last interaction with Plaintiff prior to the filing of his SAC occurred on April 11, 2018, during MHP Hoover's module rounds. (*Id.* at ¶ 10; *id.* at 11.) Plaintiff was angry and agitated with a raised voice, but he did not present as hostile, delusional, or responsive to internal stimuli or hallucinations. (*Id.* at 11.) MHP Hoover listened to Plaintiff's concerns about various issues. (*Id.*) Plaintiff presented MHP Hoover with a kite intended for MHP Taylor, which

---

[5] Based on MHP Hoover's review of Plaintiff's medical records, it appears Plaintiff was seen by other SCJ MHPs and medical staff in February and March 2018. (*Id.* at ¶ 9.)

1    MHP Hoover delivered as requested. (*Id.*) MHP Hoover determined that it was not necessary to

2    change Plaintiff's housing assignment or place him on suicide watch. (*Id.*)

3                      2.    *MHP Taylor*

4            MHP Taylor saw Plaintiff on two occasions prior to the filing of the SAC—March 9,

5    2018, and March 23, 2018. (Taylor Decl. at ¶ 12; *id.* at 8.) On March 9, 2018, MHP Taylor saw

6    Plaintiff with Dr. Andrews. (*Id.* at ¶ 12.) On March 23, 2018, MHP Taylor spoke with Plaintiff at

7    length after Plaintiff reported that his seven-year-old nephew had been murdered. (*Id.* at ¶ 14; *id.*

8    at 8.) Plaintiff appeared calm and cooperative, his thought process seemed organized and goal

9    directed, his thought content was reality based as he did not seem to exhibit signs or symptoms

10   of delusional processes involving abnormal thinking or a severe paranoid reaction, and he was

11   able to answer questions appropriately. (*Id.* at 8.) He denied auditory and visual hallucinations,

12   and there was no objective evidence of a response to internal stimuli. (*Id.*) His mood was

13   depressed, and he had a tearful affect. (*Id.*) He denied an intent to self-harm or suicidal ideations,

14   and he convincingly agreed to remain safe while incarcerated with no intent to harm himself or

15   others. (*Id.*) Plaintiff was compliant with his prescribed psychotropic medications, and he

16   accepted resources for grief and loss. (*Id.*) Based on their conversation, MHP Taylor concluded

17   that Plaintiff did not need to be on suicide watch or to have his housing placement changed. (*Id.*)

18                     3.    *MHP Merkel*

19           MHP Merkel was not assigned to Plaintiff's housing module and so she did not have

20   regular contact with him. (Merkel Decl. (Dkt. # 259) at ¶ 3.) She recalls only one interaction with

21   Plaintiff when MHP Taylor asked her to deliver information to Plaintiff regarding the SCJ's

22   procedures related to the Prison Rape Elimination Act. (*Id.* at ¶ 5.) MHP Merkel does not recall

23

Plaintiff expressing any concerns regarding his mental health or showing any symptoms that would raise mental health issues. (*Id.*)

With respect to Plaintiff's allegation that MHP Merkel placed him on suicide watch, MHP Taylor attests that there is no CorEMR record indicating that any MHP put Plaintiff on behavioral watch during the period of time at issue in the SAC. (Taylor Decl. at ¶ 15.)

### C. Failure to Protect Claims against Classification Mitchell, Classification Wafstet, and MHP Hoover

In his verified motion to supplement, Plaintiff alleges the following. On March 27, 2018, while he was housed in cell 07 of the maximum-security unit, he saw the inmate housed in cell 10 spit on and threaten to kill a deputy. (Supp. at 2-3.) Plaintiff wrote a statement reporting what he witnessed, and as a result, felony charges were brought against the inmate. (*Id.*) An unknown deputy informed the inmate that Plaintiff had written a statement, and the inmate began to verbally threaten to rape and kill Plaintiff. (*Id.* at 3-4.) These threats went on for five to six hours each day and caused Plaintiff "mental anguish," "emotional trauma," and made him think of harming himself. (*Id.*)

Plaintiff alleges that at approximately 2:00 p.m. on April 7, 2018, he verbally informed Classification Mitchell and Classification Wafstet of the threats and asked them to do something to make the threats stop. (*Id.* at 4.) Allegedly, Classification Mitchell responded that Plaintiff was lucky both he and the inmate were in maximum security, so the inmate would not be able to get to him. (*Id.* at 6.) The classification specialists did nothing to stop the threats. (*Id.* at 4-5.)

Plaintiff further alleges that on April 8, 2018, he informed MHP Hoover of the threats, but MHP Hoover claimed there was nothing he could do and had to leave quickly to respond to an emergency in another part of the facility. (*Id.* at 4.)

According to Plaintiff, on April 18, 2018, Deputies Garka and Ray overheard the inmate threatening Plaintiff and asked Plaintiff to write a statement. (*Id.* at 7.) The deputies gave Plaintiff's statement to Sergeant Johnston, who had the inmate moved to a different module in the jail. (*Id.*) Sgt. Johnston returned to interview Plaintiff about the allegation of sexual harassment, and formal felony charges against the inmate were referred to the prosecutor's office on April 19, 2018. (*Id.*)

Also, on April 19, 2018, Plaintiff submitted a grievance complaining about Classification Mitchell's, Classification Wafstet's, and MHP Hoover's failure to respond to his complaints. (Dkt. # 39-2 at 17.) On April 24, 2018, Classification Supervisor Kimberly Parker responded that she spoke with Classification Mitchell and Classification Wafstet, and both stated Plaintiff never reported any threats to them. (*Id.*) Indeed, in support of the motion for summary judgment, Classification Mitchell, Classification Wafstet, and MHP Hoover attest they had regular interactions with Plaintiff but do not recall either hearing an inmate threaten him or him reporting threats to them. (Mitchell Decl. (Dkt. # 260) at ¶¶ 5-9; Wafstet Decl. (Dkt. # 262) at ¶¶ 5-12; Hoover Decl. at ¶¶ 16-19.) Each Defendant states that they record interactions with inmates in their respective online databases, the "inmate activity log" for classification staff and CorEMR for MHPs, and they would have recorded an inmate verbally reporting that another inmate threatened him. (Mitchell Decl. at ¶ 11; Wafstet Decl. at ¶ 10; MHP Hoover Decl. at ¶ 19.) However, none of them recorded any complaints from Plaintiff on April 7 or 8, 2018. (Mitchell Decl. at ¶ 13; Wafstet Decl. at ¶ 12; *id.* at 9 (activity log); Hoover Decl. at ¶ 18; *id.* at 10-11 (CorEMR records).) A review of Plaintiff's CorEMR record indicates no entry on April 8, 2018, and that when MHP Hoover spoke with Plaintiff on April 11, 2018, he did not present any complaints or concerns that warranted transfer to a different module. (Hoover Decl. at 10-11.) A

review of Plaintiff's inmate activity log shows that on April 7, 2018, Classification Wafstet made legal copies for Plaintiff, provided him with manila envelopes for legal mailings, and provided him with indigent colored pencils and a deck of playing cards. (Wafstet Decl. at 9-10.) The log shows that she also interacted with him on April 10, 2018, April 14, 2018, and April 17, 2018. (*Id.* at 10-13.) The activity log shows that on April 18, 2018, Plaintiff reported the threats from the inmate in cell 10 and that a keep separate order was issued that day. (*Id.* at 13-14.)

### D. Retaliation Claims against Lt. Moll and Custody Deputies Gross, Ohipeni, Hansen, Hart, Wilson, Freeman, Adepoju, Nicholas, and Hovey

#### 1. Lt. Moll

Plaintiff alleges that Lt. Moll authorized custody deputies to wake him up in the middle of the night to receive grievance and kite responses because he filed so many of them. (Statement at 71.) Plaintiff's claim is based on Lt. Moll's response to a January 2, 2018 grievance he filed about Custody Deputy Adepoju waking him up in the middle of the night. (*Id.*; Moll Decl. (Dkt. # 273) at 8 (Grievance # 18-05).) Lt. Moll responded on January 5, 2018:

> Grievances must be processed in a timely manner as per your inmate handbook. We are a 24/7 operation and due to the large number of grievances and kites that you submit it's entirely reasonable to assume that the responses to those will be delivered to you at odd hours. I will speak with the deputy about the manner in which he wakes inmates in order to serve paperwork.

(Moll Decl. at 8.)

According to Lt. Moll, in December 2017, he began to receive and review grievances and kites Plaintiff submitted complaining that custody deputies assigned to the graveyard shift in his housing module were waking him up unnecessarily during nighttime hours. (*Id.* at ¶ 8.) Lt. Moll also observed that the number of grievances Plaintiff submitted about a variety of issues had dramatically increased that month. (*Id.* at ¶ 9.) Lt. Moll explains that in responding to Plaintiff's January 2, 2018 grievance, he did not give permission or encourage custody deputies assigned to

the graveyard shift to wake Plaintiff while he was sleeping. (*Id.* at ¶¶ 10, 17 ("At no time did I suggest or encourage custody deputies I supervised to intentionally wake Mr. Brennan up during nighttime hours to return grievance responses to him, as a way to respond to the amount of grievances he submitted.").) In fact, he directed custody deputies, by email and in person, to deliver mail to Plaintiff during the graveyard shift only if he was awake, and if he was not awake, to wait until breakfast was served or he was otherwise awake. (*Id.* at ¶ 11; *see also id.* at 10-18.) It appears Plaintiff continued to experience nighttime waking through the month of January 2018 but that the issue was resolved after Lt. Moll met with Plaintiff on February 7, 2018, to discuss the issue. (*See id.* at 10-18; *id.* at ¶ 16 ("After my correspondence with Mr. Brennan and an in person meeting with him to address his complaints, I did not receive additional grievances from Mr. Brennan about custody deputies waking him up and I believed the issue had been resolved.").)

### 2. *Custody Deputy Gross*

Plaintiff alleges Custody Deputy Gross woke him up at 1:30 a.m. on December 15, 2017, to initial for receipt of a grievance response. (Statement at 73; Dkt. # 27-9 at 40 (Grievance # 1150 with delivery dated 12/15/2017 at "0130".) Plaintiff alleges Custody Deputy Gross woke him up in retaliation for filing grievances on other issues. (Statement at 71.)

Custody Deputy Gross attests that he did not intentionally wake Plaintiff up to deliver legal mail or grievance responses to him, that he did not speak with other custody deputies about Plaintiff's grievances or lawsuits at any time during Plaintiff's stay at the SCJ, and that he abided by Lt. Moll's direction to avoid waking Plaintiff during the nighttime hours. (*See* Gross Decl. (Dkt. # 269) at ¶¶ 3-7.)

1

### 3. Custody Deputy Ohipeni

2 Plaintiff alleges Custody Deputy Ohipeni woke him up at 1:30 a.m. on January 6, 2018,

3 to initial for receipt of two grievance responses, including Lt. Moll's response to Grievance #

4 18-05. (Statement at 73; *see also* Dkt. # 27-9 at 46 (Appeal of Grievance # 1160 with delivery

5 dated 1/6/2018 at "0130"); Moll Decl. at 8 (Grievance # 18-05 with delivery dated 1/6/2018 at

6 "0130").) Plaintiff alleges Custody Deputy Ohipeni woke him up in retaliation for filing

7 grievances on other issues and because Lt. Moll's response to Grievance # 18-05 had given the

8 custody deputy permission to wake Plaintiff. (Statement at 71, 73.)

9 Custody Deputy Ohipeni attests that it is not his normal practice to read grievances or

10 responses to grievances when he is delivering them to inmates and that he was unaware of the

11 correspondence between Lt. Moll and Plaintiff about custody deputies waking Plaintiff up.

12 (Ohipeni Decl. (Dkt. # 275) at ¶ 7.) Custody Deputy Ohipeni further declares that he did not

13 speak with other custody deputies about Plaintiff's grievances or lawsuits at any time during

14 Plaintiff's time at the SCJ, and that he did not discuss with other custody deputies that waking

15 Plaintiff up was a way to respond to the grievances he submitted. (*Id.*) According to Custody

16 Deputy Ohipeni, it is not his practice to wake inmates up to deliver grievance responses to them

17 and that Plaintiff was awake when he delivered the grievance responses on January 6, 2018. (*Id.*

18 at ¶ 9; *see also id.* at 7.)

19

### 4. Custody Deputy Hansen

20 Plaintiff alleges Custody Deputy Hansen woke him up at 2:00 a.m. on April 11, 2018, to

21 initial for receipt of two grievance responses. (Statement at 73; Dkt. # 27-3 at 62 (Grievance

22 # 329 with delivery dated 4/11/2018 at "0200"); Dkt. # 27-9 at 47 (Grievance # 325 with

23 delivery dated 4/11/2018 at "0200").) Plaintiff alleges Custody Deputy Hansen woke him up in

retaliation for filing grievances on other issues. (Statement at 71.) Defendants submit evidence that Plaintiff never filed any grievances related to this event. (Parker Decl. at ¶ 20.)

### 5.    Custody Deputy Hart

Plaintiff alleges Custody Deputy Hart woke him up at 3:13 a.m. on February 17, 2018, to initial for receipt of a grievance response. (Statement at 73; Dkt. # 27-3 at 38 (Grievance # 150 with delivery dated 2/17/2018 at "0313").) Plaintiff alleges Custody Deputy Hart woke him up in retaliation for filing grievances on other issues. (Statement at 71.) Defendants submit evidence that Plaintiff never filed any grievances related to this event. (Parker Decl. at ¶ 17.)

### 6.    Custody Deputy Wilson

Plaintiff alleges Custody Deputy Wilson woke him up at 11:45 p.m. on August 28, 2017, to initial for receipt of a grievance response. (Statement at 73; Dkt. # 27-3 at 39 (Grievance # 872 with delivery dated 8/28/2017 at "2345").) Plaintiff alleges Custody Deputy Wilson woke him up in retaliation for filing grievances on other issues. (Statement at 71.) Defendants submit evidence that Plaintiff never filed any grievances related to this event. (Parker Decl. at ¶ 13.)

### 7.    Custody Deputy Freeman

Plaintiff alleges Custody Deputy Freeman woke him up at 11:29 p.m. on January 29, 2018, to initial for receipt of a grievance response. (Statement at 73; Dkt. # 27-3 at 43 (Grievance # 100 with delivery dated 1/29/2018 at "2329").) Plaintiff alleges Custody Deputy Freeman woke him up in retaliation for filing grievances on other issues. (Statement at 71.) Defendants submit evidence that Plaintiff never filed any grievances related to this event. (Parker Decl. at ¶ 16.)

1

8.    *Custody Deputy Adepoju*

2    Plaintiff alleges that Custody Deputy Adepoju woke him up at 1:59 a.m. on January 2,

3    2018, to initial a grievance response. (Statement at 73.) Plaintiff also alleges that on January 27,

4    2018, Custody Deputy Adepoju kicked his door at 3:20 a.m. while putting mail under it, and then

5    20 minutes later banged on his door to give him legal mail. (*Id.* at 75.) Plaintiff alleges that he

6    asked to speak with a sergeant, and at 5:00 a.m. a sergeant came to his cell with six custody

7    deputies and moved him to a different housing module. (*Id.*; *see also* Dkt. # 27-5 at 24 (Inmate

8    Activity Log explaining decision to move Plaintiff).) Plaintiff alleges Custody Deputy Adepoju

9    woke him up in retaliation for filing grievances about the custody deputy. (Statement at 75.)

10    Custody Deputy Adepoju attests that it is not his practice to wake inmates up to deliver

11    legal mail and that if an inmate is asleep, he waits until a later time. (Adepoju Decl. (Dkt. # 265)

12    at ¶ 6.) He further declares that Lt. Moll spoke with him on January 6, 2018, about not waking

13    Plaintiff to deliver mail during the night and that he made efforts not to wake Plaintiff. (*Id.* at

14    ¶ 7.) Custody Deputy Adepoju attests that he did not speak with any custody deputies about

15    Plaintiff's complaints or grievances at any time and that the only conversation he had about

16    Plaintiff was when Lt. Moll advised him to not wake Plaintiff to deliver mail. (*Id.* at ¶ 8.) He also

17    was not aware on January 2, 2018, that Plaintiff had complained about being woken up. (*Id.*)

18

9.    *Custody Deputy Nicholas*

19    On January 12, 2018, one of Custody Deputy Nicholas's duties was to assist Licensed

20    Practical Nurse ("LPN") Meader with the medication pass through Plaintiff's housing module.

21    (Nicholas Decl. (Dkt. # 274) at ¶ 7.) When LPN Meader attempted to provide Plaintiff with his

22    prescribed medication, he started to question her about whether she was providing the correct

23    number and type of pills. (Statement at 13-15; Nicholas Decl. at ¶ 7.) According to Custody

Deputy Nicholas, Plaintiff was argumentative, was speaking over the nurse, and would not let her answer his questions or provide any information. (Nicholas Decl. at ¶ 7.) Because Plaintiff was raising his voice, using profane language, and speaking in a rude and argumentative manner, Custody Deputy Nicholas advised him to either accept the medication or indicate that he was refusing. (*Id.* at ¶ 8; *see also* Statement at 15.) Plaintiff states that Custody Deputy Nicholas was trying to bully and intimidate him into taking medication when he was not sure the correct doses had been provided. (Statement at 15.) Plaintiff states that Custody Deputy Nicholas told him that he had a bad attitude and that if he did not accept the medication he would be infracted for disrespect and abuse of services. (*Id.* at 17.) After LPN Meader was able to explain which pills were being dispensed, Plaintiff accepted the medication. (*Id.* at 15.) According to Custody Deputy Nicholas, Plaintiff then demanded that he be provided with a grievance form, which he knew he could only receive from a member of the classification unit due to his placement on a grievance restriction. (Nicholas Decl. at ¶ 9.)

     As a result of this incident, Custody Deputy Nicholas charged Plaintiff with four major rule violations: (1) failing to obey an order or instruction by a staff member by arguing with LPN Meader instead of following Custody Deputy Nicholas's direction to either accept or decline the medication; (2) harassing or intimidating staff with intent to interfere with their duties by arguing with and attempting to bully LPN Meader and by attempting to bully or intimidate Custody Deputy Nicholas by immediately requesting a grievance form; (3) interfering with module operations by delaying the medication distribution to other inmates; and (4) manipulating staff to get his own way by demanding a grievance form even though he knew he was on grievance restriction. (*Id.* at 10.) Following a hearing on January 18, 2018, Plaintiff was found guilty of the

1  second charge based on his use of profane language toward Custody Deputy Nicholas and LPN

2  Meader and lost two days of good time credit. (*Id.* at 9.)

3      On January 19, 2018, Plaintiff submitted a grievance about Custody Deputy Nicholas,

4  alleging that the custody deputy "continues to harass me every chance he gets" and threatened to

5  infract him for requesting a kite form. (Dkt. # 27-3 at 45.) Plaintiff also stated that he feared that

6  the custody deputy would physically harm him. (*Id.*) Lt. Moll responded by stating that he saw

7  no cause for Plaintiff to fear Custody Deputy Nicholas and that the lieutenant had informed the

8  custody deputy that Plaintiff could receive kite forms. (*Id.*) Plaintiff alleges that because he was

9  not on kite restriction, Custody Deputy Nicholas retaliated against him by threatening to infract

10  him for requesting a kite form. (Statement at 19-21.)

11     On January 29, 2018, Custody Deputy Nicholas charged Plaintiff with an infraction for

12  harassment and lying, alleging that the incidents Plaintiff complained about in multiple kites and

13  grievances filed following the January 12, 2018 infraction were completely fabricated. (Dkt.

14  # 27-3 at 23.) Custody Deputy Nicholas pointed out that prior to the January 12, 2018 infraction,

15  Plaintiff had not filed a single kite or grievance about him, and he denied the allegations of

16  wrongdoing in the January 19, 2018 grievance. (*Id.*) Custody Deputy Nicholas believed Plaintiff

17  was abusing the grievance process by submitting false information. (Nicholas Decl. at ¶ 12.) The

18  infraction was ultimately dismissed without action because the grievance process had not yet

19  been completed. (Dkt. # 27-3 at 22.) Plaintiff alleges Custody Deputy Nicholas violated his

20  rights by infracting him for his good faith use of the grievance system. (Statement at 29.)

21     On February 4, 2018, Custody Deputy Nicholas charged Plaintiff with a second infraction

22  for harassment and lying. (Dkt. # 27-3 at 23-25.) Plaintiff alleges Custody Deputy Nicholas

23  issued this infraction because Plaintiff had filed a public disclosure request about the custody

deputy. (Statement at 31.) Custody Deputy Nicholas attests he did not find out about the public records request until months later. (Nicholas Decl. at ¶ 14.) Ultimately, Plaintiff was not disciplined for harassing Custody Deputy Nicholas or lying on grievance forms. (*Id.* at ¶ 12.)

### 10.   *Custody Deputy Hovey*

Plaintiff alleges that a few days after he filed a public disclosure request about Custody Deputy Hovey, the custody deputy began unnecessarily searching his cell. (Statement at 31.) He also alleges that she read a grievance he filed against her and the civil docket sheet in this case that lists her as a defendant, and then she infracted him for having a piece of tape in his cell. (*Id.*)

Custody Deputy Hovey attests that on March 30, 2018, she conducted a visual check of every cell in Plaintiff's module, and when she checked Plaintiff's cell, she observed that he had tape, which is a contraband item. (Hovey Decl. (Dkt. # 272) at ¶¶ 8-12.) The week prior, she had removed numerous pieces of tape from Plaintiff's cell and Sergeant Sweeny had specifically informed Plaintiff that he could not have tape in his cell. (*Id.* at ¶ 14.) Accordingly, she infracted him for possessing contraband. (*Id.* at 7.) Following a hearing, the infraction was mitigated from a major to a minor violation. (*Id.*) Custody Deputy Hovey attests that at the time of these events, she did not know Plaintiff had filed a public records request or lawsuit against her. (*Id.* at ¶¶ 15-16.)

### E.   Retaliation and State Law Battery Claims against Custody Deputy Crew

Plaintiff alleges that on April 5, 2018, Custody Deputy Crew woke him up at 3:00 a.m. to ask if he wanted his recreation time but then made him wait an hour before escorting him to the shower. (Statement at 59.) Plaintiff claims this was a "clear case of harassment" based on Plaintiff filing grievances and kites about the custody deputy two weeks prior. (*Id.*) One

1  grievance alleged that Custody Deputy Crew destroyed six of Plaintiff's legal mail envelopes.

2  (*Id.*)

3      Plaintiff alleges that at around 4:30 a.m., he asked to be escorted back to his cell, and in

4  accordance with SCJ policy for maximum security inmates, Custody Deputy Crew and Custody

5  Deputy Thomas Song handcuffed him behind his back to escort him. (*Id.*) At Plaintiff's request,

6  they stopped at the book cart. (*Id.*) Custody Deputy Song retrieved the book Plaintiff identified

7  and then opened the door to the housing module. (*Id.*) Plaintiff alleges that as Custody Deputy

8  Crew proceeded to escort him into the module:

9      Deputy Crew #6145 tightened his grip on my arm to the point that it was causing
       me extreme pain. I asked him to lighten up with his grip on my arm. His response
10     to this was to grip and squeeze my arm even harder and taking his free hand he
       grabbed the handcuff chain and twisted it causing the cuffs to click tighter and dig
11     into my wrists. As he was doing this he lifted up on them and forced me to go up
       on my toes. He started pushing me harder and faster towards my cell and upon
12     getting to the cell he pushed me inside and slammed the cell door.

13  (*Id.* at 59-61.) Plaintiff alleges that he had bruising on his arm that lasted over a week. (*Id.* at

14  59-67.) Plaintiff claims that Custody Deputy Crew's actions amount to "assault." (*See id.* at 57.)

15      Plaintiff alleges that after he was back in his cell, he overheard Custody Deputy Crew

16  complaining to Custody Deputy Song that Plaintiff had recently filed a grievance about him. (*Id.*

17  at 61, 65.) Plaintiff alleges that Custody Deputy Crew then processed Plaintiff's legal mail while

18  making jokes about his legal mail envelopes and desire to have them in one piece. (*Id.* at 61.)

19      Inconsistent with these allegations, Plaintiff also alleges that Custody Deputy Crew woke

20  him up at 4:30 a.m. on April 5, 2018, to initial for receipt of three grievance responses. (*Id.* at 73;

21  Dkt. # 27-8 at 16-18 (Grievance ## 317, 284, and 282 with delivery dated 4/5/2018 at "04:30").)

22  Plaintiff alleges Custody Deputy Crew woke him up in retaliation for filing grievances on other

23  issues. (Statement at 71.)

1    Custody Deputy Crew does not dispute that he woke Plaintiff up at 3:00 a.m. on April 5,

2    2018, but he explains that he woke Plaintiff to inform him of his recreation time that day and to

3    find out if he wished to use it. (Crew Decl. (Dkt. # 267) at ¶ 6.) According to Custody Deputy

4    Crew, inmates in the maximum-security module are scheduled for one hour of recreation each

5    day, and only one inmate has recreation at a time, so the periods are staggered over the course of

6    an entire day, including during the graveyard shift. (*Id.* at ¶¶ 7-8.) Plaintiff was scheduled for

7    recreation at approximately 4:00 a.m. that day. (*Id.* at ¶ 9.) In Custody Deputy Crew's training

8    and experience, inmates become upset if the custody deputy does not specifically inform them of

9    their recreation time, even if it is in the middle of the night or early morning. (*Id.* at ¶ 10.)

10   Accordingly, Custody Deputy Crew woke Plaintiff before his scheduled recreation to ask if he

11   wished to use his time. (*Id.* at ¶ 9.) After the inmate who was scheduled before Plaintiff finished

12   his recreation time, Custody Deputy Crew returned to Plaintiff's cell and escorted him to the

13   recreation area. (*Id.* at ¶ 11.)

14   Custody Deputy Crew states that he and Custody Deputy Song escorted Plaintiff to and

15   from recreation in accordance with the policy in the maximum-security housing module. (*Id.* at

16   ¶ 13.) Custody Deputy Crew's account of the return trip aligns with Plaintiff's in terms of the

17   stop at the book cart and Custody Deputy Song opening the housing module door. (*See id.* at

18   ¶¶ 14-15.) Custody Deputy Crew attests that as they moved into housing module, Plaintiff

19   simultaneously advised that Custody Deputy Crew was holding too tight, tensed up and twisted

20   toward the custody deputy, and reached the fingers of his right hand to the fingers of his left

21   hand, which Custody Deputy Crew believed, based on his training and experience, was an

22   indication that Plaintiff might be attempting to position himself to resist or strike out. (*Id.* at

23   ¶¶ 15-16.) In response, Custody Deputy Crew switched his hands to the trained escort position

1   with his left hand about Plaintiff's left elbow and his right hand on Plaintiff's left hand. (*Id.* at

2   ¶ 17.) Custody Deputy Crew denies twisting the cuffs in any manner. (*Id.* at ¶ 18.) According to

3   Custody Deputy Crew, they then escorted Plaintiff into his cell and Custody Deputy Crew got

4   Plaintiff's legal mail. (*Id.* at ¶ 19.)

5       Custody Deputy Crew attests that he was unaware of Plaintiff's grievances regarding

6   custody deputies waking him in the night or Lt. Moll's response to his grievance, and that he did

7   not speak with any other custody deputies about Plaintiff's grievances. (*Id.* at ¶¶ 24-26.)

8       **F.  Procedural History**

9       Plaintiff initiated this action *pro se* in December 2017, seeking to bring claims against 53

10  defendants. (Dkt. # 1.) Upon screening, the Honorable James P. Donohue declined to serve the

11  complaint and granted Plaintiff leave to amend. (Dkt. # 15.) Judge Donohue declined to serve

12  Plaintiff's amended complaint as well. (Dkt. ## 18, 25.) After Plaintiff filed his verified SAC,

13  Judge Donohue issued a Report and Recommendation, recommending that some claims and

14  defendants be dismissed and that others be allowed to go forward. (Dkt. ## 27, 39, 41.) The

15  Honorable John C. Coughenour adopted the Report and Recommendation. (Dkt. # 44.) Judge

16  Donohue directed that the SAC be served on the remaining 26 defendants, and Defendants

17  timely answered. (Dkt. ## 49, 101, 102.) Judge Donohue subsequently set discovery and

18  dispositive motions deadlines. (Dkt. # 103.) Primarily due to Plaintiff's transfers between

19  institutions, the deadlines were extended several times and finally set for November 18, 2019,

20  and December 18, 2019, respectively. (Dkt. # 227; *see also* Dkt. ## 197, 218.)

21      Prior to the expiration of these deadlines, Custody Deputies John Hatchell, Collins

22  Machyo, and Elias Chavez moved for summary judgment. (Dkt. ## 192 (Hatchell Mot.), 193

23  (Machyo/Chavez Mot.).) In October 2019, Judge Coughenour adopted the recommendation of the

    undersigned that Custody Deputy Hatchell's motion be granted and that Custody Deputies Machyo

1   and Chavez's motion be granted in part and denied in part. (Dkt. # 234.) Specifically, Judge

2   Coughenour denied the motion for summary judgment as to Plaintiff's Fourteenth Amendment

3   failure to protect claim against Custody Deputy Machyo. (*Id.*)

4         On October 31, 2019, Defendant Kimberly Parker moved for summary judgment on the two

5   claims against her. (Dkt. # 236.) On November 27, 2019, several other Defendants moved for

6   summary judgment on the conditions of confinement claims against them. (Dkt. # 244.) Judge

7   Coughenour adopted the recommendation of the undersigned that the motions for summary judgment

8   be granted. (Dkt. # 287.)

9         On December 18, 2019, the remaining Defendants filed two motions for summary judgment.

10  (Mot. 1; Mot. 2.) Plaintiff did not file a timely response. Defendants filed reply briefs noting

11  Plaintiff's failure to oppose their motions. (Dkt. ## 282, 283.) Five days after the noting date,

12  Plaintiff filed a letter indicating that he did not receive the motions and supporting evidence until the

13  noting date and asking that the Court deny the motions based on all the documents he has filed in the

14  case thus far. (Resp.) To give Plaintiff an opportunity to file substantive oppositions, the Court

15  re-noted the motions filed for April 13, 2020. (Dkt. # 285.) Plaintiff did not file an additional

16  opposition.

## III.   LEGAL STANDARDS

### A.  Summary Judgment Standard

17        Summary judgment is appropriate when the "movant shows that there is no genuine

18  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

19  Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is

20  "whether the evidence presents a sufficient disagreement to require submission to a jury or

21  whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at

22  251-52.

The moving party bears the initial burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by presenting evidence that negates an essential element of the nonmoving party's case, or by establishing that the nonmovant lacks the quantum evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute. *Id.* at 252. In addition, it is the nonmoving party's responsibility to "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoted source omitted). The Court need not "scour the record in search of a genuine issue of triable fact." *Id.* (quoted source omitted); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, and may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S. at 248; *see also Nigro v. Sears, Roebuck & Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (district court cannot disregard evidence at the summary judgment stage solely based on its self-serving nature, even if

it is uncorroborated, unless it "states only conclusions and not facts that would be admissible in evidence" (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059 n.5, 1061 (9th Cir. 2002) (district court properly disregarded the declaration that included facts beyond the declarant's personal knowledge and did not indicate how she knew the facts to be true); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."))).

A verified complaint, like Plaintiff's SAC, "may be treated as an affidavit to oppose summary judgment to the extent it is based on personal knowledge and sets forth specific facts admissible in evidence." *Keenan v. Hall*, 83 F.3d 1083, 1090 n.1 (9th Cir. 1996) (internal quotations omitted); *see also Jones v. Blanas*, 393 F.3d 918, 922-23 (9th Cir. 2004); *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir. 2000) (en banc). But allegations that are based merely on Plaintiff's belief are insufficient to oppose summary judgment, as are unsupported conjecture and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *McElyea v. Babbitt*, 833 F.2d 196, 197-98 n.1 (9th Cir. 1987) (per curiam).

Furthermore, Plaintiff's response brief did not make any specific argument or identify any particular evidence in the record to refute Defendants' claims. (*See* Resp.) Given the number of filings in the record, the Court declines to "scour the record" for facts that favor Plaintiff and looks only to his verified SAC, Statement, the exhibits referenced therein that are relevant to the claims at issue here, his motion to supplement, and the relevant exhibits referenced therein. *Keenan*, 91 F.3d at 1279.

1    **B.  Section 1983 Claims**

2         To sustain a § 1983 civil rights claim, Plaintiff must show (1) he suffered a violation of

3    rights protected by the Constitution or created by federal statute, and (2) the violation was

4    proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48

5    (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). To satisfy the second prong,

6    Plaintiff must allege facts showing how individually named defendants caused or personally

7    participated in causing the harm alleged in the complaint. *Arnold v. IBM*, 637 F.2d 1350, 1355

8    (9th Cir. 1981).

9    **C.  Qualified Immunity**

10         The doctrine of qualified immunity protects government officials from civil liability

11   under § 1983 if "their conduct does not violate clearly established statutory or constitutional

12   rights of which a reasonable person would have known." *Stanton v. Sims*, 134 S. Ct. 3, 4-5

13   (2013) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "Qualified

14   immunity gives government officials breathing room to make reasonable but mistaken judgments

15   about open legal questions" and "protects 'all but the plainly incompetent or those who

16   knowingly violate the law.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v.*

17   *Briggs*, 475 U.S. 335, 341 (1986)). "To determine whether an officer is entitled to qualified

18   immunity, a court must evaluate two independent prongs: (1) whether the officer's conduct

19   violated a constitutional right, and (2) whether that right was clearly established at the time of the

20   incident." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (citing

21   *Pearson*, 555 U.S. at 232). Either prong may be considered first. *Pearson*, 555 U.S. at 236.

22   When addressing qualified immunity on summary judgment, the Court "may not resolve genuine

23

1    disputes of fact in favor a the [moving] party" and must view the evidence in the light most

2    favorable to the non-movant. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam).

3                                 **IV.    DISCUSSION**

4    **A. Medical Care Claims**

5           A pretrial detainee's right to adequate medical care arises under the due process clause of

6    the Fourteenth Amendment. *Gordon v. County of Orange*, 888 F.3d 1118, 1120 (9th Cir. 2018).

7    The elements of such a claim are:

8           (i) the defendant made an intentional decision with respect to the conditions under
       which the plaintiff was confined; (ii) those conditions put the plaintiff at
9       substantial risk of suffering serious harm; (iii) the defendant did not take
       reasonable available measures to abate that risk, even though a reasonable official
10      in the circumstances would have appreciated the high degree of risk involved—
       making the consequences of the defendant's conduct obvious; and (iv) by not
11      taking such measures, the defendant caused the plaintiff's injuries.

12   *Id.* at 1125. "With respect to the third element, the defendant's conduct must be objectively

13   unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular

14   case.'" *Id.* (quoting *Castro*, 833 F.3d at 1071 (quoted sources omitted)). A defendant's "mere

15   lack of due care" is insufficient to state a Fourteenth Amendment claim. *Id.* (quoting *Castro*, 833

16   F.3d at 1071 (quoted source omitted)). Thus, a plaintiff must "prove more than negligence but

17   less than subjective intent—something akin to reckless disregard." *Id.* (quoting *Castro*, 833 F.3d

18   at 1071).

19                *1.    Nurse Bellinger*

20          Plaintiff's claim against Nurse Bellinger is based on her responses to three grievances he

21   filed in December 2017 complaining about the medical treatment he was receiving for blood

22   clots and asking to see a provider. She responded that Plaintiff had seen a provider on December

23   4, 2017, received an ultrasound on December 5, 2017, and the ultrasound indicated that

medication was not necessary. Plaintiff was seen by a provider on January 4, 2018. Nurse

Bellinger attests that her responses to Plaintiff's grievances did not impact or delay any treatment

or appointments and that in her professional opinion, he was not in any imminent danger of

serious harm. (Bellinger Decl. at ¶¶ 13, 18, 19.) Viewing this evidence in the light most

favorable to Plaintiff, no reasonable jury could conclude that Nurse Bellinger acted with reckless

disregard in responding to Plaintiff's grievances. Accordingly, the Court recommends that

summary judgment be granted in Nurse Bellinger's favor.

2.    *Mental Health Care*

Plaintiff makes several claims about the mental health care he received at the SCJ. First,

he complains generally about his inability to meet privately with MHPs. As MHP Taylor's

declaration establishes, MHPs at the SCJ do not conduct ongoing counseling treatment of

inmates, who may be released at any time. (Taylor Decl. at ¶ 8.) Rather, MHPs make regular

rounds through the housing modules and focus their evaluations on inmate safety and welfare.

(*Id.* at ¶¶ 7-8.) The evidence, when viewed in Plaintiff's favor, establishes that Plaintiff was

treated in accordance with this framework as he regularly interacted with MHP Hoover, saw

MHP Taylor on two occasions, and was visited by other MHPs.

Second, Plaintiff alleges MHP Hoover failed to respond to a complaint Plaintiff filed

noting that long exposure to isolation can lead to thoughts of self-harm, and that MHP Merkel

delayed placing him on suicide until 13 days after he filed the complaint. Defendants dispute that

MHP Merkel placed him on suicide watch. (Taylor Decl. at ¶ 15.) Nevertheless, assuming the

truth of Plaintiff's verified allegations, Defendants are entitled to summary judgment on this

claim. Plaintiff alleges only that he made a general complaint regarding the effects of isolation

on individuals, not that he alleged he was experiencing thoughts of self-harm. (Statement at 105

("[I]n one of my appeals to the max status [review committee] I had written in it that [. . .] long exposure to isolation could lead to harm to self-thoughts.").) Plaintiff's general complaint would not have put Defendants on notice that Plaintiff was experiencing thoughts of self-harm. Nor would Plaintiff's history of suicide attempts or mental health diagnoses alone have put a reasonable official on notice that Plaintiff was at substantial risk of suffering serious harm. A careful review of Plaintiff's mental health records demonstrates that MHP Hoover saw Plaintiff on a number of occasions and directly asked about Plaintiff's mental health; at most, Plaintiff endorsed thoughts of self-harm but denied any intent to act upon those thoughts. (Hoover Decl. at 8-11.) No reasonable juror could conclude that MHP Hoover and MHP Merkel were deliberately indifferent in their failure to promptly respond to his generalized statement regarding the potential effects of isolation.

Third, Plaintiff alleges that MHP Hoover and MHP Merkel refused to see him in his housing module. The unrefuted medical record establishes that MHP Hoover and other MHPs saw Plaintiff on several occasions while they were making their rounds through his module. MHP Merkel did not see Plaintiff because she was assigned to work in a different module. Given these facts, Plaintiff's bare assertion cannot sustain deliberate indifference claims against MHP Hoover and MHP Merkel.

Fourth, Plaintiff alleges MHP Hoover did not respond to his January 24, 2018 request for treatment until February 2, 2018. Prison officials may be deemed to have been deliberately indifferent to an inmate's serious medical needs "when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (quoted sources and internal quotation marks omitted). The unrefuted medical evidence establishes that MHP Hoover visited Plaintiff's cell on January 23, 2018, and then again on January 29, 2018.

(Hoover Decl. at 9.) Although Plaintiff's grandfather had recently passed away—the event that prompted his January 24, 2018 request for treatment—Plaintiff denied that he was suicidal during his January 29, 2018 discussion with MHP Hoover. (*Id.*) Plaintiff generally alleges that the conditions of his detention "increased" his mental health issues and that he experienced daily thoughts of suicide and self-harm, but he does not submit any evidence that the five-day delay between his request to speak with MHP Hoover and his conversation with the MHP caused him injury. No reasonable jury could conclude that MHP Hoover acted with reckless disregard to a substantial risk that Plaintiff would suffer serious harm.

Finally, Plaintiff claims that MHP Taylor failed to respond to his January 12, 2018 in-person request to discuss his concerns regarding mental health treatment. Plaintiff states that he filed a grievance regarding this failure, and the response was that MHP Taylor attempted to visit him on January 26, 2018, but Plaintiff was in court that day. MHP Taylor's first documented interaction with Plaintiff occurred on March 9, 2018, approximately two months after Plaintiff asked to speak with him. (Taylor Decl. at 8.) Nevertheless, Plaintiff saw other MHPs on multiple occasions in the interim, including three visits with MHP Hoover in January 2018 after Plaintiff asked to speak with MHP Taylor. (Hoover Decl. at ¶¶ 6-9.) Although Plaintiff complains about the mental health care he received during this time, he fails to explain why he needed to speak with MHP Taylor specifically. Given that Plaintiff received mental health care during the two months between his request to see MHP Taylor and his first visit with MHP Taylor, no reasonable jury could conclude that MHP Taylor acted with reckless disregard to any serious medical need.

In sum, viewing the evidence in the light most favorable to Plaintiff, MHPs Hoover, Taylor, and Merkel are entitled to summary judgment on the medical care claims against them.

**B. Failure to Protect Claims**

Pretrial detainees have a Fourteenth Amendment "due process right to be free from violence from other inmates." *Castro*, 833 F.3d at 1067. To establish a violation of this right, a pretrial detainee must establish that the defendant was deliberately indifferent under the following standard:

> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
>
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
>
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and
>
> (4) By not taking such measures, the defendant caused the plaintiff's injuries.

*Id.* at 1071. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily "turn[ ] on the 'facts and circumstances of each particular case.'" *Id.* (quoted source omitted). The plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

In Plaintiff's verified motion to supplement, he alleges that he told Classification Mitchell, Classification Wafstet, and MHP Hoover that the inmate in cell 10 was repeatedly threatening to kill and rape him, and that they failed to remedy the situation. Approximately 10 days later, on April 18, 2018, Plaintiff reported the threats to a SCJ staff member who had the inmate moved to a different housing module. Plaintiff alleges that as a result of the constant harassment, he suffered "mental anguish," "emotional trauma," and thoughts of self-harm. Although Defendants dispute Plaintiff's assertion that he informed them of the threats prior to April 18, 2018, the Court must credit Plaintiff's verified statements on summary judgment. *See*

1    *Keenan*, 83 F.3d at 1090 n.1 (verified complaint "may be treated as an affidavit to oppose

2    summary judgment to the extent it is based on personal knowledge and sets forth specific facts

3    admissible in evidence") (internal quotations omitted).

4         Viewing the evidence in the light most favorable to Plaintiff, however, a reasonable

5    officer under the circumstances would not have appreciated that a high degree of risk was

6    involved. Plaintiff and the inmate were housed in a maximum-security module where the inmate

7    would never have the opportunity to execute his threats of physical harm. Further, receiving a

8    single complaint regarding the inmate would not have put a reasonable officer on notice that

9    Plaintiff was at substantial risk of suffering serious emotional harm. Indeed, Plaintiff saw

10   Classification Wafstet three times between April 7, 2018, when he allegedly informed her of the

11   threats, and April 18, 2018, when the inmate was moved to a different module, but he does not

12   claim that he renewed any of his complaints regarding the inmate during this time. (*See* Wafstet

13   Decl. at 10-13.) Similarly, Plaintiff spoke with MHP Hoover on April 11, 2018, but he does not

14   allege that he raised the issue of inmate's threats. (*See* Hoover Decl. at 10-11.) At most,

15   Classification Mitchell, Classification Wafstet, and MHP Hoover could be said to have

16   negligently responded to Plaintiff's alleged complaints, but no reasonable jury could conclude

17   that they acted with reckless disregard. Accordingly, they are entitled to summary judgment.

18        **C. Exhaustion of Retaliation Claims**

19        Under the PLRA, a prisoner must exhaust "available" administrative remedies before

20   filing suit. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *Albino v. Baca*, 747 F.3d 1162, 1165 (9th

21   Cir. 2014) (en banc); 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison

22   conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in

23   any jail, prison, or other correctional facility until such administrative remedies as are available

1    are exhausted."). The exhaustion requirement "applies to all inmate suits about prison life,

2    whether they involve general circumstances or particular episodes, and whether they allege

3    excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Even when

4    the prisoner seeks relief not available in grievance proceedings, notably money damages,

5    exhaustion is still a prerequisite to suit. *Booth v. Churner*, 532 U.S. 731, 741 (2001). Exhaustion

6    must be proper, meaning that the prisoner must complete the administrative review process in

7    accordance with the applicable rules. *Woodford*, 548 U.S. at 92-95.

8         Defendants bear the initial burden of showing that there was an available administrative

9    remedy and that Plaintiff did not exhaust that remedy. *Albino*, 747 F.3d 1169, 1172. Once that

10   showing is made, the burden shifts to Plaintiff, who must either demonstrate that he, in fact,

11   exhausted administrative remedies or "come forward with evidence showing that there is

12   something in his particular case that made the existing and generally available administrative

13   remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172; *see also Ross v. Blake*, 136

14   S. Ct. 1850 (2016) (setting forth examples of when administrative remedies would be

15   unavailable). The ultimate burden, however, rests with Defendants. *Albino*, 747 F.3d at 1172.

16        Summary judgment is appropriate if the undisputed evidence, viewed in the light most

17   favorable to Plaintiff, shows a failure to exhaust. *Id.* at 1166, 1168; Fed. R. Civ. P. 56(a). If

18   administrative remedies have not been exhausted at the time an action is brought, the action must

19   be dismissed without prejudice. *McKinney v. Carey*, 311 F.3d 1198, 1199 (9th Cir. 2002) (per

20   curiam); *see also Wyatt v. Terhune*, 315 F.3d 1108, 1120 (9th Cir. 2003), *overruled on other*

21   *grounds by Albino*, 747 F.3d at 1162 ("If the district court concludes that the prisoner has not

22   exhausted nonjudicial remedies, the proper remedy is dismissal of the claim without prejudice.").

23

In this case, proper exhaustion of a grievance requires the inmate to file an appeal of the SCJ's grievance response. (*See* Parker Decl. at ¶¶ 4-5.) Plaintiff appealed many grievance responses, thereby demonstrating that he understood the administrative process and that it was generally available to him. (*See, e.g.*, Dkt. ## 27-8 at 30, 33, 53; 27-9 at 1, 3, 15, 23, 30.) Defendants argue that Plaintiff failed to exhaust his administrative remedies for his retaliation claims against Custody Deputies Wilson, Freeman, Gross, Ohipeni, Hansen, and Hart. (Mot. 2 at 9-11.) As discussed above, Defendants have submitted evidence that Plaintiff did not file grievances complaining about the alleged retaliatory actions of Custody Deputies Wilson, Freeman, Hansen, and Hart. Defendants, therefore, have satisfied their initial burden of showing that administrative remedies were available, and that Plaintiff did not exhaust these claims. Plaintiff did not file a substantive response, and therefore he has not shown that he in fact exhausted his remedies or that there was "something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino*, 747 F.3d at 1172. Accordingly, viewing the evidence in the light most favorable to Plaintiff, the Court concludes that summary judgment based on a failure to exhaust is appropriate for the retaliation claims against Custody Deputies Wilson, Freeman, Hansen, and Hart.

Defendants' evidence as to Custody Deputies Gross and Ohipeni, however, is insufficient to meet their initial summary judgment burden. Plaintiff's claim against Custody Deputy Gross is based on events that allegedly occurred on December 15, 2017, but Defendants submit evidence that Plaintiff did not file any grievances "about Custody Deputy Gross waking him up at 1:30 a.m. on December *21*, 2017." (Parker Decl. at ¶ 14 (emphasis added).) Whether Plaintiff submitted a grievance complaining about events that occurred on December 21, 2017, does not establish that he failed to exhaust a claim related to events that occurred on December 15, 2017.

1    Similarly, Defendants submit evidence that Plaintiff did not file any grievances "about Custody

2    Deputy Ohipeni waking him up at 1:59 a.m. on January 2, 2018" (Parker Decl. at ¶ 15 (emphasis

3    added)), but Plaintiff's claim against Deputy Ohipeni is based on events that allegedly occurred

4    on January 6, 2018. For these reasons, Defendants' motion for summary judgment based on

5    failure to exhaust should be denied as to Custody Deputies Gross and Ohipeni.

6    **D.  Retaliation**

7          The First Amendment protects prisoners' right to file grievances and pursue civil rights

8    litigation in federal court without retaliation. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir.

9    2012); *Silva v. DiVittorio*, 658 F.3d 1090, 1104 (9th Cir. 2011). "Within the prison context, a

10   viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a

11   state actor took some adverse action against an inmate (2) because of (3) that prisoner's

12   protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment

13   rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v.*

14   *Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).

15          "The prisoner must show that the type of activity in which he was engaged was

16   constitutionally protected, that the protected conduct was a substantial or motivating factor for

17   the alleged retaliatory action, and that the retaliatory action advanced no legitimate penological

18   interest." *Quiroz v. Horel*, 85 F. Supp. 3d 1115, 1124 (N.D. Cal. 2015) (citing *Hines v. Gomez*,

19   108 F.3d 265, 267-68 (9th Cir. 1997)); *see also Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir.

20   1995) (plaintiff bears burden of pleading and proving the absence of legitimate correctional goals

21   for the conduct of which he complains). Additionally, "a plaintiff who fails to allege a chilling

22   effect may still state a claim if he alleges he suffered some other harm." *Brodheim v. Cry*, 584

23   F.3d 1262, 1269 (9th Cir. 2009).

Absent direct evidence, retaliatory motive may be shown by the timing of the allegedly retaliatory act and inconsistency with previous actions. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003). Circumstantial evidence of motive that can defeat summary judgment usually includes: "(1) proximity in time between protected speech and the alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and pretextual." *McCollum v. Cal. Dept. of Corrections & Rehab.*, 647 F.3d 870, 882 (9th Cir. 2011) (internal quotation marks and citation omitted). However, mere speculation that defendants acted out of retaliation is not sufficient. *Wood v. Yordy*, 753 F.3d 899, 904-05 (9th Cir. 2014) (affirming grant of summary judgment where no evidence that defendants knew of plaintiff's prior lawsuit or that defendants' disparaging remarks were made in reference to prior lawsuit).

Retaliation claims brought by prisoners must be evaluated in light of concerns over "excessive judicial involvement in day-to-day prison management, which 'often squander[s] judicial resources with little offsetting benefit to anyone.'" *Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (quoting *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). In particular, courts should "'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (quoting *Sandin*, 515 U.S. at 482).

### 1.    Lt. Moll

Plaintiff alleges that Lt. Moll authorized custody deputies to wake him up in the middle of the night to receive grievance and kite responses because he filed so many of them. (Statement at 71 (citing Grievance # 18-05).) Lt. Moll attests, "At no time did I suggest or encourage custody deputies I supervised to intentionally wake Mr. Brennan up during nighttime hours to

1    return grievance responses to him, as a way to respond to the amount of grievances he

2    submitted." (Moll Decl. at ¶ 17.) The evidence further establishes that Lt. Moll emailed and

3    spoke with his staff on several occasions to direct that they avoid waking Plaintiff. (*See id.* at

4    ¶¶ 11, 16; *see also id.* at 10-18.) Viewing the evidence in the light most favorable to Plaintiff, no

5    reasonable jury could conclude that Lt. Moll took an adverse action against Plaintiff.

6    Accordingly, summary judgment should be granted in Lt. Moll's favor.

                        2.    *Custody Deputy Gross*

8        Plaintiff alleges that in retaliation for filing grievances, Custody Deputy Gross woke him

9    up at 1:30 a.m. on December 15, 2017, to initial for receipt of a grievance response. (Statement

10   at 73.) Plaintiff does not allege that he filed any grievances against Custody Deputy Gross prior

11   to this date, and Custody Deputy Gross attests that he never spoke with other custody deputies

12   about Plaintiff filing grievances. (Gross Decl. at ¶¶ 3-7.) Viewing this evidence in Plaintiff's

13   favor, it is apparent that his allegation that Custody Deputy Gross woke him up *because* he filed

14   grievances is mere speculation. *See Wood*, 753 F.3d at 904-05 (affirming grant of summary

15   judgment where there was no evidence defendants knew of plaintiff's prior lawsuit); *Hernandez*,

16   343 F.3d at 1112 (finding unsupported conjecture is insufficient to oppose summary judgment).

17   Accordingly, Custody Deputy Gross is entitled to summary judgment.

                        3.    *Custody Deputy Ohipeni*

19       Plaintiff alleges Custody Deputy Ohipeni retaliated against him for filing grievances by

20   waking him up in the middle of the night on January 6, 2018, to have him initial two grievance

21   responses, including Lt. Moll's response to Grievance # 18-05, which essentially authorized

22   Custody Deputy Ohipeni to wake Plaintiff. (Statement at 71, 73.) Custody Deputy Ohipeni

23

1    attests that Plaintiff was awake on January 6, 2018, when he delivered the grievances. (Ohipeni

2    Decl. at ¶¶ 7-9.)

3         Viewing the evidence in Plaintiff's favor, however, the Court must assume that Custody

4    Deputy Ohipeni did in fact wake Plaintiff on January 6, 2018. Nevertheless, Plaintiff does not

5    allege that he filed any grievances against Custody Deputy Ohipeni prior to this date and

6    Custody Deputy Ohipeni attests that he did not read Lt. Moll's grievance response or discuss

7    Plaintiff's grievances with others. Given these facts, Plaintiff's allegation that Custody Deputy

8    Ohipeni woke him *because* he engaged in protected activity is mere speculation. *See Wood*, 753

9    F.3d at 904-05; *Hernandez*, 343 F.3d at 1112. Custody Deputy Ohipeni is entitled to summary

10   judgment.

11                    *4.      Custody Deputy Adepoju*

12        Plaintiff alleges that in retaliation for filing grievances about Custody Deputy Adepoju,

13   the custody deputy woke him up in the middle of the night on January 2, 2018, and January 27,

14   2018, to deliver legal mail. (Statement at 73, 75.) Custody Deputy Adepoju attests that it is not

15   his practice to wake inmates up to deliver legal mail (Adepoju Decl. at ¶ 6), but the Court must

16   assume for the purposes of summary judgment that he woke Plaintiff as alleged.

17        The only grievance about Custody Deputy Adepoju that Plaintiff specifically cites in his

18   Statement is Grievance # 18-05, which he submitted on January 2, 2018. (*See* Moll Decl. at 8.)

19   Because there is no evidence Plaintiff previously filed grievances about the custody deputy, and

20   because Custody Deputy Adepoju attests that he did not speak with anyone other than Lt. Moll

21   about Plaintiff's grievances, Plaintiff's claim that Custody Deputy Adepoju woke him up on

22   January 2, 2018, *because* he engaged in protected activity is mere speculation. *See Wood*, 753

23   F.3d at 904-05; *Hernandez*, 343 F.3d at 1112. Accordingly, this claim should be dismissed.

1        The same analysis, however, does not apply to Plaintiff's claim related to January 27,

2  2018, because at that time, Custody Deputy Adepoju knew Plaintiff filed Grievance # 18-05

3  about him. (*See* Adepoju Decl. at ¶¶ 7-8 (admitting that he spoke with Lt. Moll about Plaintiff's

4  complaints).) Plaintiff does not have direct evidence that Custody Deputy Adepoju woke him up

5  on January 27, 2018, "because of" the grievance, but this element can be established by

6  circumstantial evidence including, "(1) proximity in time between protected speech and the

7  alleged retaliation; (2) [that] the [defendant] expressed opposition to the speech; [or] (3) other

8  evidence that the reasons proffered by the [defendant] for the adverse . . . action were false and

9  pretextual." *McCollum*, 647 F.3d at 882 (internal quotation marks and citation omitted).

10        Plaintiff relies primarily on the proximity in time between the grievance, Lt. Moll

11  speaking with Custody Deputy Adepoju and instructing him not to wake Plaintiff, and the

12  alleged events of January 27, 2018, all of which occurred over the course of less than four weeks.

13  Plaintiff's allegations also suggest that there was no legitimate penological interest in waking

14  him. Indeed, Defendants do not assert a legitimate penological interest in waking Plaintiff to

15  deliver mail during the night, and in fact, Lt. Moll repeatedly informed custody deputies to avoid

16  waking Plaintiff. (*See* Mot. 2 at 17-20; Moll Decl. at ¶¶ 11-17; *see generally* Adepoju Decl.

17  (failing to address allegations related to January 27, 2018).) Considering Custody Deputy

18  Adepoju's knowledge of Plaintiff's grievance, the timing of the alleged events, and the absence

19  of any penological justification, a reasonable jury could conclude that Custody Deputy Adepoju

20  woke Plaintiff on January 27, 2018, because Plaintiff complained about him in Grievance #

21  18-05. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003) ("Depending on the

22  circumstances, three to eight months is easily within a time range that can support an inference

23  of retaliation.").

The final question is whether there is sufficient evidence of harm. A prisoner does not need to demonstrate a total chilling of his First Amendment rights in order to establish a retaliation claim. *Rhodes*, 408 F.3d at 568 ("Speech can be chilled even when not completely silenced."). Rather, the proper inquiry is "whether an official's acts would chill or silence a person of ordinary firmness from future First Amendment activities." *Id.* at 568-69 (quoted source omitted, emphasis omitted); *see also Brodheim*, 584 F.3d at 1271 ("an objective standard governs the chilling inquiry"). A plaintiff can establish that an action would silence a person of ordinary firmness by showing that the action caused harm that was more than minimal. *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012); *Brodheim*, 584 F.3d at 1262; *Rhodes*, 408 F.3d at 567, n.11 (destruction of inmate's property and assaults on inmate enough to chill inmate's First Amendment rights). Plaintiff does not allege that Custody Deputy Adepoju waking him in the middle of the night to deliver mail chilled or silenced the exercise of his First Amendment rights. Plaintiff also fails to allege any other form that could be considered more than minimal. Accordingly, Plaintiff fails to establish that Custody Deputy Adepoju's actions would chill or silence a person of ordinary firmness. The Court thus concludes that Custody Deputy Adepoju is entitled to summary judgment.

### 5.    *Custody Deputy Nicholas*

Plaintiff alleges Custody Deputy Nicholas retaliated against him by: (1) threatening to infract him for requesting a kite form; (2) infracting him on January 29, 2018, for his good faith use of the grievance process; and (3) infracting him on February 4, 2018, for filing a public records request. The Court considers each claim below.

i.    Request for a Kite Form

According to Plaintiff, Custody Deputy Nicholas threatened to infract him for requesting a kite form because the custody deputy believed he was on kite restriction when, in fact, he was only on grievance restriction. (Statement at 19-21.) Assuming that requesting a kite form is a protected activity, *see Entler v. Gregoire*, 872 F.3d 1031, 1039-40 (9th Cir. 2017) (filing kite is a protected activity), Plaintiff fails to establish the requisite harm. Plaintiff does not claim that Custody Deputy Nicholas's alleged threat chilled or silenced the exercise of his First Amendment rights. Furthermore, Plaintiff does not show that Custody Deputy Nicholas's alleged threat caused him any harm, much less harm that would chill or silence "a person of ordinary firmness from future First Amendment activities." *Rhodes*, 408 F.3d at 568-69. Because Plaintiff has identified no harm, this First Amendment retaliation claim should be dismissed.

ii.    January 29, 2018 Infraction

Plaintiff's next claim against Custody Deputy Nicholas is based on the January 29, 2018 infraction he issued claiming that Plaintiff was harassing him by filing kites and grievances about him based on fabricated events. (*See* Dkt. # 27-3 at 22-23.) Plaintiff claims he was using the grievance system in good faith. (Statement at 29.)

Defendants do not dispute that Plaintiff engaged in protected activity when he filed kites and grievances about Custody Deputy Nicholas. They argue instead that there is insufficient evidence of retaliatory intent and that Custody Deputy Nicholas acted to advance legitimate penological interests. (Mot. 2 at 14-15.) But the January 29, 2018 infraction itself clearly establishes that Plaintiff's kites and grievances were the motivating factor for the infraction: "Brennan is Harassing me by alleging and making false allegations *in the form of kites and grievances*." (Dkt. # 27-3 at 23 (emphasis added).) Although Custody Deputy Nicholas attests

1    that he believed Plaintiff was abusing the grievance process by submitting false information

2    (Nicholas Decl. at ¶ 12), Plaintiff's verified pleading states that he utilized the grievance process

3    in good faith (Statement at 29). Viewing this evidence in Plaintiff's favor, a reasonable jury

4    could conclude that Plaintiff's complaints about Custody Deputy Nicholas in his kites and

5    grievances were true. Assuming Plaintiff raised legitimate complaints against Custody Deputy

6    Nicholas, there would be no penological interest served by infracting Plaintiff for this behavior.[6]

7    Furthermore, receiving a baseless infraction for filing kites and grievances would chill a person

8    of ordinary firmness from continuing to file valid kites and grievances. Viewing the evidence in

9    Plaintiff's favor, a reasonable jury could conclude that Custody Deputy Nicholas violated

10    Plaintiff's First Amendment rights.

11          In light of this conclusion, the Court must determine whether Custody Deputy Nicholas is

12    entitled to qualified immunity because the right was not clearly established at the time of the

13    incident.[7] *See Saucier*, 533 U.S. at 201. In other words, the Court must determine whether it

14    would be clear to a reasonable deputy that his conduct was unlawful in the situation he

15    confronted. *Id.* at 202; *see also Kisela*, 138 S. Ct. at 1153 ("An officer cannot be said to have

16    violated a clearly established right unless the right's contours were sufficiently definite that any

17    reasonable official in the defendant's shoes would have understood that he was violating it.").

18    This inquiry "must be undertaken in light of the specific context of the case, not as a broad

19    general proposition." *Saucier*, 533 U.S. at 201.

20

21

22    _____

23    [6] Because the January 29, 2018 infraction was never resolved on the merits, there is no administrative record
      regarding whether Custody Deputy Nicholas's claims were founded.

      [7] Defendants make general argument regarding qualified immunity but do not develop them as to this claim against
      Custody Deputy Nicholas. (*See* Mot. 2 at 21-23.)

1    "Because the focus is on whether the officer had fair notice that [his] conduct was

2    unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct."

3    *Kisela*, 138 S. Ct. at 1152 (quoted source omitted, alteration added). The Supreme Court's

4    "caselaw does not require a case directly on point," but "existing precedent must have placed the

5    statutory or constitutional question beyond debate." *Id.* (quoted source omitted). It is Plaintiff's

6    burden to establish that the law was clearly established at the time of the incident in January

7    2018. *See Greene v. Camreta*, 588 F.3d 1011, 1031 (9th Cir. 2009), *vacated in part*, 661 F.3d

8    1201 (9th Cir. 2011).

9        At the time of the incident, it was clearly established that retaliating against a prisoner for

10   his use of the prison grievance system violates a prisoner's constitutional rights. *See Rhodes*, 408

11   F.3d at 567; *Pratt*, 65 F.3d at 806 (stating the "prohibition against retaliatory punishment is

12   'clearly established law' in the Ninth Circuit, for qualified immunity purposes"). Viewing the

13   evidence in the light most favorable to Plaintiff, it would have been clear to a reasonable custody

14   deputy that infracting an inmate for filing legitimate grievances violated the law. Custody

15   Deputy Nicholas, therefore, is not entitled to summary judgment on this claim.

16                          iii.    February 4, 2018 Infraction

17       Plaintiff claims Custody Deputy Nicholas infracted him on February 4, 2018, because he

18   filed a public records request about the custody deputy. Defendants argue that they are entitled to

19   summary judgment on this claim because requesting public records is not a protected activity for

20   purposes of First Amendment retaliation claims. (Mot. 2 at 13.) The undersigned previously

21   addressed this issue in the Report and Recommendation on Custody Deputy Machyo's motion

22   for summary judgment and concluded that Plaintiff's retaliation claim failed as a matter of law:

23           The Supreme Court has held that there is no constitutional right of access to
             government information. *See, e.g.*, *McBurney v. Young*, 569 U.S. 221, 232 (2013)

("This Court has repeatedly made clear that there is no constitutional right to obtain all the information provided by FOIA laws."); *Houchins v. KQED*, 438 U.S. 1, 15 (1978) ("Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control."). But neither the Supreme Court nor Ninth Circuit have addressed the question presented here, which is whether the First Amendment protects the right to *request* public records. In an unpublished decision, the Tenth Circuit has held that requesting public records is not a protected activity. *Allen v. Lang*, 738 Fed. Appx. 934, 938-39 (10th Cir. 2018). District Courts around the country are split. *Compare, e.g.*, *Entler v. McKenna*, No. 11-5081, 2011 WL 4368367, at * 4 (W.D. Wash. July 19, 2011), *R & R adopted*, 2011 WL 4368729 (W.D. Wash. Sept. 19, 2011), *aff'd*, 487 Fed. Appx. 417 (9th Cir. 2012) ("While Plaintiffs have a First Amendment right to pursue litigation free from retaliation, they have no First Amendment right to request public records under the PRA . . . ."); *Rodriguez v. Serna*, No. 17-1147, 2019 WL 2340958, at *6 (D.N.M. June 3, 2019) ("The Court concludes that requesting public records is not a protected activity under the First Amendment . . . ."); *Werner v. Therien*, No. 99-12497, 2005 WL 1000010, at *8 (D. Mass. Mar. 31, 2005) (holding that prisoner's public records request was not a protected activity for purposes of a First Amendment retaliation claim), *with Handy-Clay v. City of Memphis*, No. 10-2927, 2013 WL 5305239, at * 13 (W.D. Tenn. Sept. 19, 2013) (rejecting claim that requesting public records was not a protected activity and collecting cases holding "that the act of requesting public records is a speech act protected by the First Amendment").[8]

Given that there is no binding authority on this issue, the Court follows the judges in this District who have already concluded that there is no First Amendment right to request public records. *See Entler*, 2011 WL 4368367, at * 4. Because Plaintiff does not have a First Amendment right to request public records, his retaliation claim against Deputy Machyo fails as a matter of law.

---

[8] [Original footnote 5] The court in *Handy-Clay* collected the following cases: *McAvey v. Orange-Ulster BOCES*, 805 F. Supp. 2d 30, 39-40 (S.D.N.Y. 2011) ("Here, McAvey's FOIL request to the Goshen police department constituted citizen speech" and "McAvey engaged in the speech at issue here (the FOIL request) in her role as a citizen, as opposed to her role as a public employee, and that speech is protected against retaliation by the First Amendment."); *Kerr v. City & Cnty. of San Francisco*, No. 10-5733, 2012 WL 3877752 (N.D. Cal. Sept. 6, 2012) ("As to whether the requests were expressive speech, under the circumstances presented here, a reasonable factfinder could infer Dr. Rivero and Plaintiff intended to convey a message that they suspected that the Gift Fund was being managed and used improperly."); *Benkoski v. Wasilewski*, No. 07-0197, 2008 WL 4414741 (M.D. Pa. Sept. 24, 2008) *aff'd*, 584 F.3d 1102 (3d Cir. 2009) ("None of the Defendants dispute that the Plaintiffs' actions are the type typically afforded protection under the First Amendment and the Court agrees that Plaintiffs' attempt to obtain public records as part of their investigation constituted protected activity."); *Moore v. Gabriel*, No. 05-31L, 2007 WL 917291 (M.D. Ga. Mar. 22, 2007) ("The Court has found that the Frazier memorandum and Plaintiff's Open Records Act requests satisfy the requirements for protected speech. The speech clearly relates to the potential abuse and mismanagement of ABHS resources by agency officials.").

(Dkt. # 232 at 12-13.) Judge Coughenour adopted this Report and Recommendation in full. (Dkt. # 234.) For the reasons articulated with respect to Custody Deputy Machyo, the Court concludes that Custody Deputy Nicholas is entitled to summary judgment on this claim.

### 6.   *Custody Deputy Hovey*

Plaintiff brings two claims against Custody Deputy Hovey. First, he argues that she improperly searched his cell because he filed a public records request about her. (Statement at 31.) As just discussed with respect to Custody Deputy Nicholas, filing a public records request is not a protected activity, and summary judgment should be granted on this claim.

Second, Plaintiff asserts that Custody Deputy Hovey retaliated against him for filing a grievance against her and naming her as a defendant in this lawsuit by infracting him in March 2018 for having a piece of tape in his cell. (*Id.*) Defendants argue that Custody Deputy Hovey was acting to advance legitimate penological interests. They present unrefuted evidence that on March 30, 2018, Custody Deputy Hovey was instructed to conduct a visual check of every cell in Plaintiff's module. (Hovey Decl. at ¶¶ 9-10.) When she checked Plaintiff's cell, she observed that he had tape, a contraband item that inmates are prohibited from keeping in their cells because it can be used to fashion items into weapons. (*Id.* at ¶¶ 11-13.) The week prior, she had removed numerous pieces of tape from Plaintiff's cell and Sgt. Sweeny had specifically warned him that he could not have tape in his cell. (*Id.* at ¶ 14.) Because Plaintiff had tape in his cell after being warned it was contraband, she issued the infraction. (*Id.* at 7.) She attests that she acted in accordance with her training and SCJ policy for the purpose of safety and security at the SCJ. (*Id.* at ¶ 17.) Viewing this evidence in the light most favorable to Plaintiff, no reasonable jury could conclude that Custody Deputy Hovey did not have a legitimate penological interest in

1    infracting Plaintiff for possessing contraband. Accordingly, summary judgment should be

2    granted on this claim.

3                    7.       *Custody Deputy Crew*

4            Plaintiff claims Custody Deputy Crew retaliated against him for filing grievances and

5    kites about the custody deputy by taking three separate actions on the morning of April 5, 2018:

6    (1) waking him up at 3:00 a.m.; (2) squeezing his arm so tight it left bruises for a week; and (3)

7    waking him up at 4:30 a.m. (Statement at 59-61, 65, 71, 73.) Custody Deputy Crew does not

8    dispute that he knew about the grievances and kites Plaintiff filed against him. (*See generally*

9    Crew Decl.) The Court discusses each event below.

10                   i.       3:00 a.m. Wakeup

11           Plaintiff alleges Custody Deputy Crew woke him up at 3:00 a.m. on April 5, 2018, a full

12   hour before his 4:00 a.m. recreation time, in retaliation for Plaintiff filing a grievance about him

13   two weeks prior. According to Custody Deputy Crew, inmates become upset if they are not

14   specifically informed of their recreation time—even if it is in the middle of the night—so he

15   woke Plaintiff to notify him of his time and see if he wished to use it. (Crew Decl. at ¶¶ 9-10.)

16   Defendants argue that Custody Deputy Crew was advancing legitimate penological interests by

17   assisting Plaintiff in accessing his recreation time and that there is no evidence to support a

18   causal connection to retaliation. (Mot. 2 at 19.) Legitimate penological goals include promoting

19   efficiency and security. *Barrett v. Premo*, 101 F. Supp. 3d 980, 993 (D. Or. 2015). Custody

20   Deputy Crew's practice of waking inmates to inform them of their scheduled recreation times

21   and then escorting them at the designated time promotes both legitimate interests. Furthermore,

22   Plaintiff does not allege that Custody Deputy Crew's actions chilled his First Amendment rights

23

1    or identify any other harm that could be considered more than minimal. Accordingly, Custody

2    Deputy Crew is entitled to summary judgment on this claim.

3                    ii.    Use of Force

4            Plaintiff alleges that as Custody Deputy Crew escorted him back to his cell after his

5    recreation time on April 5, 2018, the custody deputy tightened his grip on Plaintiff's arm to the

6    point that it caused Plaintiff "extreme pain." (Statement at 59.) According to Plaintiff, when he

7    asked Custody Deputy Crew to "lighten up," the custody deputy responded by squeezing his arm

8    even harder and using his free hand to twist the handcuff chain, causing the cuffs to click tighter

9    and dig into Plaintiff's wrists. (*Id.* at 50-61.) Plaintiff alleges Custody Deputy Crew lifted up on

10   the handcuff chain, which forced Plaintiff to walk on his toes, pushed Plaintiff hard and fast into

11   his cell, and slammed the door. (*Id.*) Plaintiff alleges he then heard Custody Deputy Crew

12   complaining to Custody Deputy Song about a grievance Plaintiff had recently filed about him.

13   (*Id.* at 61, 65.) Plaintiff further alleges that as Custody Deputy Crew proceeded to process

14   Plaintiff's legal mail, he made jokes about the issue Plaintiff had raised in the grievance. (*Id.* at

15   61.)

16           Custody Deputy Crew states that as Plaintiff advised he was holding too tight, Plaintiff

17   began to tense up and move his hands together, which led Custody Deputy Crew to believe

18   Plaintiff might be attempting to resist or strike out. (Crew Decl. at ¶¶ 15-16.) Custody Deputy

19   Crew attests that he switched his hands to a different position and escorted Plaintiff into his cell

20   without further issue. (*Id.* at ¶¶ 17, 19.) Custody Deputy Crew denies twisting the handcuffs. (*Id.*

21   at ¶ 18.)

22           Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find

23   that Custody Deputy Crew retaliated against Plaintiff. Custody Deputy Crew allegedly took an

adverse action by squeezing Plaintiff's arm so tightly it left bruises that lasted a week. Plaintiff presents circumstantial evidence that the grievance he filed two weeks prior was the motivating factor in Custody Deputy Crew's alleged use of force, specifically, the proximity in time between the two events, Custody Deputy Crew's alleged complaint to Custody Deputy Song about Plaintiff's grievance and his subsequent jokes about the issue raised in the grievance. *See McCollum*, 647 F.3d at 882 (proximity in time between protected speech and alleged retaliation and defendant's opposition to plaintiff's speech constitute circumstantial evidence that may defeat summary judgment). Custody Deputy Crew's alleged actions would chill a person of ordinary firmness from future First Amendment activity. *See Watison*, 668 F.3d at 1116 (threat of physical violence sufficient to establish chilling conduct). Finally, although Defendants argue Custody Deputy Crew advanced legitimate penological interests in safety and security by reasonably reacting to Plaintiff's resistive behavior (Mot. 2 at 19), Plaintiff alleges that Custody Deputy Crew's hold caused "extreme pain" *before* he engaged in any behavior that could be construed as resistive or threatening. Specifically, Plaintiff alleges that Custody Deputy Crew's hold caused "extreme pain" before he asked the custody deputy to "lighten up." Custody Deputy Crew states that Plaintiff advised he was holding too tightly and at the same time tensed up and began to twist his body. Viewing this evidence in Plaintiff's favor, Plaintiff did not take any action that would have justified Custody Deputy Crew initially holding his arm so tightly it caused "extreme pain."

Because the Court has concluded a reasonable jury could find that Custody Deputy Crew violated Plaintiff's right to be free from retaliation for exercising his First Amendment right to file grievances, the Court must determine whether Custody Deputy Crew is entitled to qualified immunity because the right was not clearly established. *See Saucier*, 533 U.S. at 201. As

1  discussed above with respect to Custody Deputy Nicholas, it was clearly established that

2  retaliating against a prisoner for his use of the prison grievance system violates a prisoner's

3  constitutional rights. *See Rhodes*, 408 F.3d at 567; *Pratt*, 65 F.3d at 806. Viewing the evidence in

4  the light most favorable to Plaintiff, it would have been clear to a reasonable prison official that,

5  without provocation or penological need, gripping an inmate's arm so hard that it caused

6  "extreme pain" and bruising violated the law. Custody Deputy Crew, therefore, is not entitled to

7  summary judgment on this claim.

8                              iii.    4:30 a.m. Wakeup

9        Plaintiff also claims that Custody Deputy Crew retaliated against him by waking him up

10  4:30 a.m. on April 5, 2018, to deliver legal mail. Five sources of evidence contradict Plaintiff's

11  claim that he was asleep when Custody Deputy Crew delivered his mail that morning: Plaintiff's

12  own verified allegations that Custody Deputy Crew woke him up at 3:00 a.m. that day and then

13  assaulted him while escorting him back to his cell at around 4:30 a.m. (Statement at 59-61);

14  Custody Deputy Crew's declaration that he woke Plaintiff before Plaintiff's scheduled recreation

15  time at 4:00 a.m. and that he returned Plaintiff to his cell around 4:30 a.m. (Crew Decl. at

16  ¶¶ 9-11); Custody Deputy Song's declaration that he and Custody Deputy Crew escorted

17  Plaintiff back to his cell from his recreation time at approximately 4:25 a.m. that morning (Song

18  Decl. at ¶ 4); and both custody deputies' incident reports of the alleged force indicating that they

19  escorted Plaintiff back to his cell at 4:25 a.m. (Crew Decl. at 10; Song Decl. at 6-7).

20        Courts ruling on summary judgment generally may not resolve factual disputes in the

21  record. However, "[w]hen opposing parties tell two different stories, one of which is blatantly

22  contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

23  that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v.*

1    *Harris*, 550 U.S. 372, 380-83 (2007) (police officer entitled to summary judgment based on

2    qualified immunity in light of video evidence capturing plaintiff's reckless driving in attempting

3    to evade capture which utterly discredited plaintiff's claim that there was little or no actual threat

4    to innocent bystanders). Although this case does not involve the certainty of video evidence,

5    there is no plausible way for Plaintiff to claim that Custody Deputy Crew woke him up at 3:00

6    a.m., escorted him to the recreation area at 4:00 a.m., escorted him back to his cell at

7    approximately 4:25 a.m., and then woke him up for the second time at 4:30 a.m. Given that the

8    earlier wake-up and the timing of the subsequent events are supported by both Plaintiff and

9    Defendants' evidence, no reasonable juror could conclude that Custody Deputy Crew woke

10    Plaintiff up at 4:30 a.m. on April 5, 2018, to deliver legal mail. As such, summary judgment

11    should be granted on this claim.

12        **E.  Battery**

13        Under Washington law, battery is a "harmful or offensive contact with a person, resulting

14    from an act intended to cause the plaintiff or a third person to suffer such a contact, or

15    apprehension that such a contact is imminent." *McKinney v. City of Tukwila*, 103 Wash. App.

16    391, 408 (2000). Plaintiff alleges Custody Deputy Crew committed battery during the escort

17    back to his cell on the morning of April 5, 2018, by gripping his arm so tightly that it caused

18    "extreme pain," squeezing his arm even harder when asked to lighten up and twisting the

19    handcuff chain so that the cuffs clicked tighter and dug into his wrists. (Statement at 59-61.)

20        Defendants argue that Custody Deputy Crew's use of force was privileged under

21    Washington law.[9] (Mot. 2 at 20-21.) Pursuant to statute, "The use, attempt, or offer to use force

22

23    _____

[9] Defendants do not argue that Custody Deputy Crew is entitled to state law qualified immunity, which rests on a
different analysis from qualified immunity under § 1983. *See Staats v. Brown*, 139 Wash. 2d 757, 779 (2000)
(setting forth requirements for state law qualified immunity).

upon or toward the person of another is not unlawful . . . [w]henever necessarily used by a public officer in the performance of a legal duty . . . ." RCW 9A.16.020(1). "'Necessary' means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended." RCW 9A.16.010(1); *see also Boyles v. City of Kennewick*, 62 Wash. App. 174, 176 (1991) ("a police officer making an arrest is justified in using sufficient force to subdue a prisoner, however he becomes a tortfeasor and is liable as such *for assault and battery* if unnecessary violence or excessive force is used in accomplishing the arrest") (emphasis in original).

Defendants argue that Custody Deputy Crew was required by SCJ policy to secure and escort Plaintiff through the module and that he reasonably responded when Plaintiff tensed up and attempted to resist. (Mot. 2 at 20-21.) Defendants, however, fail to address Plaintiff's assertion that Custody Deputy Crew gripped his arm so tightly that it caused "extreme pain" *before* Plaintiff made any move that could be considered noncompliant. Viewing the evidence in Plaintiff's favor, a reasonable jury could find that Plaintiff was fully compliant with the escort at the time he alleges Custody Deputy Crew initially tightened his grip, and that under these circumstances, it was unreasonable for Custody Deputy Crew to squeeze his arm so tightly that it caused "extreme pain." Accordingly, the Court recommends that summary judgment be denied as to this claim.

### F.  The PLRA's Physical Injury Requirement

The PLRA states: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The Ninth Circuit has held that this provision "applies only to claims for mental and emotional injury," and requires "a

1    prior showing of physical injury that need not be significant but must be more than *de minimis*."

2    *Oliver v. Keller*, 289 F.3d 623, 627 (9th Cir. 2002). To the extent a plaintiff's claims for

3    compensatory, nominal, or punitive damages are premised on alleged constitutional violations,

4    "and not on emotional or mental distress suffered as a result of those violations, § 1997e(e) is

5    inapplicable and those claims are not barred." *Id.* at 630.

6            Defendants argue that this physical injury requirement bars Plaintiff from recovering

7    damages for any mental or emotional injury he suffered. (Mot. 2 at 23.) The Ninth Circuit has

8    held that the physical injury requirement does not apply to First Amendment retaliation claims.

9    *Oliver*, 289 F.3d at 628 n.5; *Canell v. Lightner*, 143 F.3d 1210, 1213 (9th Cir. 1998).

10    Accordingly, it does not limit Plaintiff's retaliation claims against Custody Deputies Nicholas

11    and Crew.

12            The Ninth Circuit has not addressed whether the physical injury requirement applies to

13    state law claims, and other courts are split. *Compare, e.g.*, *Matelsky v. Gunn*, 15 Fed. App'x.

14    686, 689 (10th Cir. 2001) (finding pending state claim frivolous absent a physical injury);

15    *O'Connor v. Carnahan*, No. 09-224, 2014 WL 293457, at *10 (N.D. Fla. Jan. 27, 2014) (finding

16    that under Eleventh Circuit authority, state law claims are limited by § 1997e(e)); *Jacobs v.*

17    *Penn. Dept. of Corr's*, No. 04-1366, 2011 WL 2295095, at *23 (W.D. Pa. June 7, 2011)

18    (prisoner's damages for mental harm based on state law claims are barred absent an actual

19    physical injury); *Schonarth v. Robinson*, No. 06-151, 2008 WL 510193, at *4 (D.N.H. Feb. 22,

20    2008) (PLRA bars recovery for mental or emotional injury under a state law claim); *Hines v.*

21    *Oklahoma*, No.07-197, 2007 WL 3046458, at *6 (W.D. Okla. Oct. 17, 2007) (state law claims

22    for intentional infliction of emotional distress barred by the PLRA absent physical injury); *Hood*

23    *v. Balido*, No. 02-669, 2002 WL 1285200, at *3 (N.D. Tex. June 4, 2002) (physical injury

1   limitation applies to all "claims brought in federal court, not merely to claims founded on federal

2   law," including "pendent state claims for emotional damages"); *Cannon v. Burkybile*, No.

3   99-4623, 2000 WL 1409852, at *6 (N.D. Ill. Sept. 25, 2000) (dismissing state claims for

4   negligence and intentional infliction of emotional distress on the basis the that the PLRA

5   precludes recovery for custodial mental or emotional damages absent a showing of physical

6   injury); *Walker v. Akers*, No. 98-3199, 1999 WL 787602, at *6 (N.D. Ill. Sept. 24, 1999) ("The

7   limitation of § 1997e(e) applies to claims brought in federal court, not merely to claims founded

8   on federal law. Accordingly, since Walker has alleged no physical injury, he could not receive

9   damages on a state-law claim . . . ."); *with Davis v. Abercrombie*, No. 11-144, 2014 WL

10  3809499, at *8 (D. Haw. July 31, 2014) (because § 1997e(e) specifically addresses federal

11  claims, it does not apply to state law claims); *Albrecht v. Williams*, No. 04-1895, 2009 WL

12  3296649, at *27 (D.N.J. Oct. 13, 2009) (disagreeing with courts that have concluded § 1997e(e)

13  applies to state law claims); *Mercado v. McCarthy*, No. 05-12124, 2009 WL 799465, at *2 (D.

14  Mass. Mar. 25, 2009) (same); *Bromell v. Idaho Dep't of Corrs.*, No. 07-197, 2006 WL 3197157,

15  at *5 (D. Idaho Oct. 31, 2006) (concluding § 1997e(e) does not bar a state law claim for

16  emotional injury).

17      This Court concurs with the weight of authority concluding that § 1997e(e) applies to

18  state law claims. "The plain language of the PLRA provides that the limitation on recovery is

19  applicable to all federal civil actions brought by a prisoner confined in a jail, prison or other

20  correctional facility." *Jacobs*, 2011 WL 2295095, at *23. As the court in *Jacobs* explained:

21      The plain meaning of the term "Federal civil action" [is] an action in which civil
        claims over which the federal court has jurisdiction are brought, i.e., all claims
22      over which the court has original jurisdiction under 28 U.S.C. § 1331, and
        supplemental jurisdiction under 28 U.S.C. § 1367. The definition of the word
        "action" is distinct from that of a "claim." As defined in Black's Law Dictionary,
23      an action is defined as "[a] civil or criminal judicial proceeding—Also termed

action at law." Black's Law Dictionary 32 (9th ed. 2009). In contrast, the definition for a claim is more narrow, i.e., "a demand for money, property, or a legal remedy to which one asserts a right; esp., *the part of a complaint in a civil action* specifying what relief the plaintiff asks for." *Id.* at 282 (emphasis added).

*Jacobs*, 2011 WL 2295095, at *23. "The statutory language of § 1997e(e), 'federal civil action,' is not ambiguous; it includes all claims in the action over which the federal court has jurisdiction." *Id.* at *24. Because Plaintiff opted to bring his state law battery claim in a federal civil action, this claim is limited by the PLRA.

Applying the physical injury requirement to Plaintiff's battery claim, the Court concludes that the alleged physical injury—bruising on Plaintiff's arm—is not more than *de minimis*. *See, e.g.*, *Oliver*, 289 F.3d at 629 (leg pain, back pain, and a painful canker sore were *de minimis*); *Hill v. Crum*, 727 F.3d 312, 323 (4th Cir. 2013) (including bruising among injuries that are *de minimis*); *Siglar v. Hightower*, 112 F.3d 191, 193-94 (5th Cir. 1997) (sore, bruised ear lasting for three days was *de minimis*); *McCall v. Crosthwait*, 336 Fed. App'x. 871, 873 (11th Cir. 2009) (bruises on elbow and shoulder were *de minimis*); *Perez v. United States*, 330 Fed. App'x. 388, 389 (3rd Cir. 2009) (*de minimis* injuries include a "sore muscle, an aching back, a scratch, an abrasion, a bruise, etc.... [like those that] people in the regular and ordinary events and activities in their daily lives do not seek medical care for"); *Corsetti v. Tessmer*, 41 Fed. App'x. 753, 755-56 (6th Cir. 2002) (two small bruises on shoulder that did not require medical attention were *de minimis*); *Luong v. Hatt*, 979 F. Supp. 481, 486 (N.D. Tex. 1997) (abrasions to forearm and chest, swelling of jaw, swollen wrists, cuts on face and tongue were *de minimis*). Thus, Plaintiff's claim for compensatory damages based on the battery claim should be dismissed, and any recovery should be limited to nominal damages to the extent such damages are available under Washington law. *See Oliver*, 289 F.3d at 630 (nominal damages available even if not expressly requested in complaint).

1

## V.     CONCLUSION

2          The Court recommends that: (1) the motion for summary judgment filed by Nurse

3   Bellinger, MHP Hoover, MHP Taylor, MHP Merkel, Classification Mitchell, and Classification

4   Wafstet (dkt. # 256) be GRANTED; and (2) the motion for summary judgment filed by Lt. Moll

5   and Custody Deputies Nicholas, Adepoju, Freeman, Gross, Hansen, Hart, Hovey, Ohipeni,

6   Wilson, and Crew (dkt. # 264) be GRANTED in part and DENIED in part. Specifically, the

7   retaliation claims against Custody Deputies Wilson, Freeman, Hansen, and Hart should be

8   DISMISSED without prejudice for failure to exhaust; the remaining retaliation claims should be

9   DISMISSED with prejudice *except* for the claim against Custody Deputy Nicholas based on the

10  January 29, 2018 infraction and the claim against Custody Deputy Crew for the use of force on

11  April 5, 2018; summary judgment should be DENIED for the battery claim against Custody

12  Deputy Crew; and Plaintiff's compensatory damages claim against Custody Deputy Crew based

13  on the alleged battery should be DISMISSED with prejudice.

14         To the extent these motions are granted, they dispose of all the claims against Nurse

15  Bellinger, MHP Hoover, MHP Taylor, MHP Merkel, Classification Mitchell, Classification

16  Wafstet, Lt. Moll, and Custody Deputies Adepoju, Freeman, Gross, Hansen, Hart, Hovey,

17  Ohipeni, and Wilson, and these Defendants should be dismissed from the lawsuit.

18         A proposed order accompanies this Report and Recommendation.

19         Objections to this Report and Recommendation, if any, should be filed with the Clerk and

20  served upon all parties to this suit within **twenty-one (21) days** of the date on which this Report

21  and Recommendation is signed. Failure to file objections within the specified time may affect

22  your right to appeal. Objections should be noted for consideration on the District Judge's

23  motions calendar for the third Friday after they are filed. Responses to objections may be filed

within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on July 3, 2020.

Dated this 8th day of June, 2020.

MICHELLE L. PETERSON
United States Magistrate Judge